174 So. 359

## STATE v. TEXAS CO.

### No. 33576.

April 26, 1937.

Gaston L. Porterie, Atty. Gen., and Justin C. Daspit, Fred. A. Blanche, and E. L. Richardson, Sp. Assts. to Atty. Gen., for the State.

Charles H. Blish, of Shreveport, for appellee.

ODOM, Justice.

The State of Louisiana through its supervisor of public accounts brought suit against the Texas Company and the surety on its bond to collect $3,737.73, plus, penalties, alleged to be due under the provisions of Act No. 142 of 1924, Act No. 6, Extra Session of 1928, as amended by Act No. 8 of 1930, and Act No. 16 of 1932. These acts levy a tax on all gasoline or motor fuel sold or used in the State of Louisiana for domestic consumption. It is alleged that the Texas Company is a dealer in gasoline, as the term "dealer" is defined by the said acts, and that from September, 1927, to October, 1932, both inclusive, it sold and delivered to B. Y. Wemple 68,558 gallons of casinghead gasoline, a motor fuel extracted or manufactured from casinghead gas, on which quantity of gasoline defendant paid no tax.

Defendant admitted that it had delivered the gasoline to Wemple as plaintiff alleged, but denied that it owed the tax. Its defense in sum was that the gasoline delivered never belonged to it, but was the property of Wemple, being his one-eighth royalty interest in casinghead gasoline manufactured by it from casinghead gas saved from oil wells which it or its predecessors had drilled on land belonging to Wemple and others under oil and gas lease contracts.

The State's demands were rejected and it appealed.

The facts are not disputed. The controversy involves a question of law, which is whether the defendant owes a tax under the admitted facts and circumstances disclosed by the record.

In the year 1910, B. Y. Wemple, as sole owner of certain lands in De Soto parish

and as owner of an undivided one-half interest in another tract, leased his lands for the production of oil and gas, the lease contract providing that in case oil was produced from the land he should receive as royalty one-eighth thereof. The lessee or its assigns drilled sixteen wells on the land owned solely by Wemple and eight wells on the land owned by him and others up to May 1, 1916. Each of the wells produced oil in paying quantities. The wells also produced along with the oil what is known as "casinghead gas," a gas saturated with volatile oil. The lessee put into operation a device or plant for the saving of the oil in the casinghead gas by condensing it into liquid form. The liquid produced by this process is known as "casinghead gasoline."

The lessee delivered to Wemple and his associates, the lessors, one-eighth of the oil, which was their royalty interest therein, but refused to account to the lessors for the one-eighth portion of the casinghead gasoline. Wemple and the other lessors brought suit against the lessee to recover the value of one-eighth of the casinghead gasoline, their theory being that the casinghead gas was a constituent part of the oil and that, under the contract giving to them one-eighth of the oil as a royalty, they were entitled also to one-eighth of whatever else came from the wells.

Their contention was upheld by the court in the case of Wemple et al. v. Producers' Oil Company, 145 La. 1031, 83 So. 232, where it was held that the lessors owned, not only one-eighth of the oil at the time it reached the surface of the ground, but owned also one-eighth of the casinghead gas from which the casinghead gasoline was extracted; and because they owned one-eighth of the casinghead gas, they owned one-eighth of the casinghead gasoline, which the court held was oil in volatile form.

We refer to that suit because Wemple, the lessor in that controversy, is the same Wemple to whom the defendant in the present case delivered the casinghead gasoline on which the State now claims the tax alleged to be owed by the defendant. The Texas Company owns and operates oil wells on the same land under the same Wemple lease, and during the period above named was manufacturing casinghead gasoline from the casinghead gas.

That case is the law of this case as relates to the ownership of the casinghead gas at the time it reaches the surface of the ground. It was there held that, at the time it reaches the surface of the ground, it is owned jointly by the lessors and the lessee in the proportion of one-eighth by the lessors and seven-eighths by the lessee.

There is in the record a stipulation of facts which shows that the casinghead gas from the oil wells on the leased premises is conveyed from the wells to an extraction plant owned and operated by the defendant, where the casinghead gasoline is extracted from the gas; that when and as extracted, the gasoline is conveyed into and stored in large tanks provided by the defendant for that purpose; and that the gasoline delivered to Wemple was drawn from the tanks and delivered to

him at the tanks into his own containers. It is further shown that this casinghead gasoline is "motor fuel" as that term is defined in the various acts levying a tax on gasoline. Wemple admitted that he used part of the gasoline he received for operating his motor vehicles and sold the rest to be used for the same purpose.

 In view of the terms of the oil lease, the holding of this court in the Wemple Case, supra, and the facts above stated, it would be perfectly clear, if no other contract were involved, that Wemple owned the casinghead gasoline delivered to him; that defendant was never the owner of it; and that when Wemple got it he was receiving that which he owned at the time of delivery and had always owned.

But counsel for the State question Wemple's ownership of the gasoline because, according to their theory, Wemple and the other lessors sold their entire interest in the casinghead gas to the defendant by contract dated May 16, 1927, and, having disposed of the casinghead gas, they owned none of the gasoline extracted from it.

The contract referred to is in the record. The first section of it says that the first parties, meaning the lessors, "do by these presents sell and agree to sell to said second party" (the Texas Company) "their one-eighth (⅛) part of the casinghead gas which may be produced and saved from the oil wells situated on the land above described" (the land subject to the Wemple lease) "and which casinghead gas may be utilized by said second party in manufacturing the same into gasoline (except such casinghead gas as may be used in operating the lease above referred to) for the price and on the terms and conditions herein set forth."

Section 4 of the contract reads as follows:

"4. The price that second party shall pay first parties for each thousand cubic feet of gas furnished shall be arrived at according to the gasoline content of said casinghead gas at the then market price for grade 'A' natural gasoline for the North Louisiana District on the last day of the calendar month for which payment is to be made, as shown by quotations published in the Oil & Gas Journal, published at Tulsa, Oklahoma, payment for said gas to be made to the first parties on or before the 20th day of the calendar month succeeding the month in which such casinghead gas is so taken and used; provided, however, that first parties have the optional right from time to time, in lieu of money payments, to receive at the plant of second party their percentage of the gasoline content per thousand cubic feet as above set forth."

Section 3 of the contract prescribes the method of ascertaining the "gasoline productivity of the casinghead gas per thousand cubic feet," that is, the gasoline content of the gas or the number of gallons of gasoline that a thousand cubic feet of the gas would produce. According to paragraph 4, the lessors were to be paid in cash for their gas at a price based on the quantity of gasoline which 1,000 cubic feet of gas would produce, the price of

the gasoline being fixed by market quotations published in Tulsa, Okl. To illustrate, if it was found by the test prescribed that 1,000 cubic feet of the gas would produce 5 gallons of casinghead gasoline and the quoted price of such gasoline at Tulsa was eight cents per gallon, the lessors were to be paid one-eighth of forty cents, or five cents a thousand cubic feet of the gas produced. This would be the result, provided the lessors did not avail themselves of the option granted them in the last clause of section 4 of the contract, which reads as follows: "Provided, however, that first parties have the optional right from time to time, in lieu of money payments, to receive at the plant of second party their percentage of the gasoline extracted from their gas, arrived at by the gasoline content per thousand cubic feet as above set forth."

On the day this contract was signed, Wemple exercised the option granted him by the last part of section 4 of the contract by the following agreement signed by him and the Texas Company:

"Barney Y. Wemple, designated party of the first part in the above and foregoing contract elects, until further notice, to receive in lieu of money payments his percentage of the gasoline extracted from his gas and provided for in the paragraph numbered 4 in the above instrument, deliveries of such quantities to be received by party of the first part at his convenience, and party of the second part acknowledges notice of such election, and agrees thereto. No particular form shall be required for notice of a change in the election of party of the first part.

"This done and signed on this 16th day of May, 1927.

"B. Y. Wemple
"The Texas Company
"By R. C. Stewart."

It is undisputed, as we have said, that the lessors, including Wemple, owned one-eighth of the casinghead gas when it reached the surface of the ground, and inasmuch as the defendant took their fraction of the gas along with its seven-eighths to its plant and there extracted from it the gasoline, the lessors owned the same fractional interest in the gasoline. This ownership resulted from the terms of the lease, as interpreted in the Wemple Case, supra.

But counsel for the State argue that the original contract was completely set aside by the subsequent contract dated May 16, 1927, to which we have referred and from which we have quoted.

The argument is sound in part only. As we interpret the contract as a whole, what it means is that the lessors were given the option either to accept payment in cash for their one-eighth interest in the gas itself according to the price and terms agreed upon, or, in lieu of money payments for their gas, to receive in full ownership one-eighth of the gasoline extracted from the gas. That, we think, is clearly shown by section 4 of the contract. However, if the contract leaves any doubt that the lessors might, by availing themselves of the option, become owners of one-eighth part of the gasoline, the statement of facts dispels that doubt.

Section 4 of the agreed statement of facts reads as follows:

"(4) It is admitted that the said quantity of casinghead gasoline so delivered to the said B. Y. Wemple, as detailed on said Exhibit 'No. 1' hereto attached and made a part hereof, represents royalty casinghead gasoline extracted from casinghead gas produced from oil wells situated upon the lands of the said B. Y. Wemple and under lease formerly held and owned by the Producers Oil Company but now held and owned by the said The Texas Company."

"Royalty," according to Webster's New International Dictionary, Second Edition, as relates to mining, is: "A share of the product or profit (as of. a mine, forest, etc.) reserved by the owner for permitting another to use the property."

It is suggested by counsel for the State, in argument and in brief that the quantity of casinghead gasoline delivered to Wemple was delivered to him in payment for his royalty interest in the casinghead gas. But that theory is not consistent with the agreed statement of facts which we have quoted, that is, that the said gasoline "represents royalty casinghead gasoline extracted from the casinghead gas." That means, for that is what it says, that defendant delivered to Wemple his royalty interest, which was an eighth, in the casinghead gasoline itself.

Our conclusion, therefore, is that defendant was never the owner of the quantity of gasoline delivered to Wemple, on which the State claims it should pay the tax.

Counsel for the State argue that, even if it be true that defendant never owned the gasoline, it is nevertheless due the tax because it manufactured or produced it, stored it in its tanks, withdrew it therefrom and delivered it to Wemple, which withdrawal and delivery, it is argued, constituted a "distribution" of it; and for these reasons the defendant became a "dealer" as that term is defined in each of the several acts of the Legislature levying a tax on gasoline and other motor fuels. They say that their argument is supported by decisions of this court as well as those of the federal courts.

As these deliveries took place on various dates between September, 1927, and October, 1932, they were made while several statutes levying taxes on gasoline were in force, and for that reason each of the said acts must be considered in order to determine whether the tax is due on all or any part of the gasoline involved.

The first law of this State levying a tax on gasoline and other motor fuels was Act No. 142, p. 241, of 1924. That act, section 1, levied a tax of two cents per gallon "on all gasoline, or motor fuel, sold in the State of Louisiana for domestic consumption." It provided in section 2 that the tax was "collectible from all persons, firms, corporations or associations of persons, engaged as *dealers* in the handling, sale or distribution of such products within the State of Louisiana."

The term "dealer" as used in the act was defined to mean "any person, firm, corporation or association of persons, who

produces, refines, manufactures, blends or compounds gasoline or motor fuel *for sale to the jobber or consumer,*" or to such persons, firms, etc., "who, in turn, *sell to the jobber or consumer.*" Section 2. The term "dealer" was further defined to mean a person, firm, etc., "who imports such gasoline or motor fuel from other States for distribution, sale, or use in the State of Louisiana." It is further provided that the "dealer" as last defined shall pay the tax on the amount of gasoline so imported and used by him, "the same as if it has been sold for domestic consumption."

Section 6 of this act provides that "It is the purpose of this Act to centralize the collection of the tax herein authorized in the hands of those who originally dispose of gasoline or motor fuel for distribution and consumption within the State."

It will be noted that the term "dealer" as defined by the act includes one who "produces, refines [or] manufactures * * * gasoline.", Hence the argument that defendant owes a tax on the gasoline delivered to Wemple because it manufactured or produced it. But the tax is to be paid only by those who produce, refine, or manufacture gasoline *"for sale* to the jobber or consumer" or to the persons "who, in turn, sell to the jobber or consumer." So that the producer or manufacturer is not due the tax unless the fuel is produced *"for sale."*

Under the act, one who imports gasoline into the State for sale or distribution is required to pay the tax. The defendant did not import the gasoline delivered to Wemple. It manufactured or produced it, not for sale, but to be delivered to him as his royalty interest. Therefore defendant owed no tax on the Wemple gasoline under this act, which was in force until December, 1928, or about fourteen months of the period during which the deliveries were made.

In December, 1928, the Legislature at an Extra Session adopted an act (No. 6) which was intended, apparently, to supersede the act of 1924. This latter act increased the tax from two cents to four cents per gallon on all motor fuel, but aside from this it added little to the old law. In so far as the payment of the tax is concerned, it made no change at all. Section 1 of the new act provided:

"That there is hereby levied a tax of four cents (4¢) per gallon on all gasoline, or motor fuel, sold, used or consumed in the State of Louisiana for domestic consumption, to be collected as hereinafter set forth."

The words "used or consumed" were not in section 1 of the act of 1924. Under the new act, section 2, the tax was "collectible from all persons, firms, corporations or associations of persons, engaged as dealers in the handling, sale or distribution of such products within the State of Louisiana." The same provision, word for word, was in section 2 of the original act. The term "dealer," both as to those who produce, refine, manufacture, blend, or compound gasoline or motor fuel "for sale to the jobber or consumer,"

or to persons who in turn sell to the jobber or consumer, and as to those who import such fuels for distribution, sale, or use in the State of Louisiana, is defined in the new act word for word as it was defined in the act of 1924.

As in the old act, so in the new, those who manufacture, produce, blend, or compound motor fuel are not required to pay the tax unless manufactured or produced "for sale to the jobber or consumer," etc. And the new act, like the old one, requires importers to pay the tax on all motor fuels imported by them "for distribution, sale, or use" in the State of Louisiana.

A careful reading of these acts shows that the term "dealer" is defined twice. The first definition refers to those who produce motor fuel. Neither the word "distribution" nor the word "use" appears in that definition. But when it is "further defined" as relating to importers, both of these words are used. And the same section (section 2) which defines the term dealer goes further and provides that:

"On all gasoline or motor fuel imported from other States and *used by him,* the 'dealer' as thus defined shall pay the tax on the amount so *imported and used,* the same as if it has (had) been sold for domestic consumption." (Note: Italics here and elsewhere in this opinion are ours.)

This definition relating to importers, and especially with reference to the terms "use" and "distribution," is highly important, as will appear later in our discussion of the cases cited by counsel.

Certain sections of Act No. 6, Extra Session of 1928, were amended by Act No. 8, Regular Session of 1930. But the sections levying the tax and defining the term "dealer" were not amended. Section 4 of each of the preceding acts related to reports to be made by dealers to the supervisor of public accounts. That section as amended (by section 1 of act of 1930) provides, among other things, that every dealer engaged in the handling or distribution of motor fuel for sale, use, or consumption in the State "shall immediately upon the producing, refining, manufacturing, blending or compounding of any gasoline or motor fuel pay to the Supervisor of Public Accounts the tax *levied herein.*" The "tax levied herein" refers, of course, to the tax which the producers are required to pay under the preceding section. The same section further provides that any dealer bringing motor fuels into the State "for sale, use or consumption therein" shall immediately "upon same coming within the boundaries of this State" pay the tax due thereon. It is provided, however, that dealers may be relieved of the duty of paying the tax immediately by executing bond in favor of the State guaranteeing such payments.

Section 6 of the act of 1928 was amended (by section 2). It contains the following new and pertinent provision:

"For the purpose of the enforcement of this Act and the collection of the tax levied hereunder, it is presumed that all gasoline or motor fuel produced, refined, manufactured, blended, or compounded in

this State imported into this State or held in this State by any dealer, is to be sold, used or consumed within this State and is subject to the tax herein levied; provided that such presumption shall be prima facie only and subject to proof furnished the Supervisor of Public Accounts."

It is admitted that the defendant produced or manufactured the gasoline delivered to Wemple and that for a time it was stored in the Texas Company's tanks; but the presumption that this particular gasoline was to be sold, used, or consumed by defendant as contemplated by those provisions of the several acts relating to persons who are liable for the tax was rebutted by proof submitted to the supervisor of public accounts.

Section 1, Act No. 6 of 1928, Ex.Sess., was amended by Act No. 16 of 1932, § 1. But the only change made was in the definition of motor fuel. Section 2 also was amended by adding thereto certain provisions (section 7-A et seq., as added by section 2 of act of 1932) relating to the rights and powers which might be exercised by the supervisor of public accounts in collecting the taxes.

Act No. 1, Extra Session of 1930, is a Joint Resolution proposing an amendment to the Constitution of 1921 providing for the levy and collection of an additional tax of one cent per gallon "on all gasoline, benzine, naphtha or other motor fuel, as herein defined, when sold, used or consumed in the State of Louisiana for domestic consumption" (section 1),

the additional tax to be used for the benefit of the public schools. The act was adopted and became part of the Constitution. It was self-operative and embodies the same terms, general provisions, and definitions as the acts hereinabove referred to.

Referring now to the cases cited by counsel, we find that they do not support the State's contention. The first is State v. Tri-State Transit Co., 179 La. 811, 155 So. 233, 235. In that case the State claimed and recovered the tax on "imported" gasoline. It was admitted that the gasoline was received in tank cars from other States and "unloaded from such tank cars into a storage tank of defendant company located in Shreveport"; that when the gasoline came to rest in the defendant's storage tank "it is thereafter distributed therefrom into the motor vehicles of defendant company and the Caddo Transfer & Warehouse Co. * * * and distributed to the respective freight and motor vehicles of defendant company and to such motor vehicles of the Caddo Transfer & Warehouse Co., as are supplied with gasoline from the storage tank in question." It was further admitted that the Tri-State Transit Company was a subsidiary of the Caddo Transfer & Warehouse Company, both engaged in the business of transporting passengers and freight by motor vehicles; and "that all of the gasoline imported into Louisiana by defendant company is imported solely for its own use and the use of its parent corporation," and was so used.

Based upon this agreed statement, the court held that defendant was liable for the tax on gasoline "used by it in conduct of its business." The holding was based squarely upon the provision contained in each of the several acts levying a tax on motor fuel which we have quoted hereinabove. For ready reference we quote it again, to wit: "On all gasoline or motor fuel imported from other States and *used by him,* the 'dealer' as thus defined shall pay the tax on the amount so imported and used, the same as if it has been sold for domestic consumption."

Another leading case cited is Gregg Dyeing Co. v. Query et al., 286 U.S. 472, 52 S.Ct. 631, 633, 76 L.Ed. 1232, 84 A. L.R. 831. That case arose under an act of the State of South Carolina which, like the acts of Louisiana, levied a tax on gasoline imported into that State. The tax there sought by the State was on gasoline which had been imported and used by the Gregg Dyeing Co. in the conduct of its business. A statement of the case by the court shows that it was the practice of the dyeing company to buy gasoline in bulk from dealers outside the State of South Carolina and to have the gasoline shipped into the State, unloaded and stored in tanks until it was needed for use in the dyeing company's manufacturing business, or used, as the court said, "for its own purposes, and is not brought into the state for resale and is not resold."

The court said: "The only kind of storage affected is that with intent to use and consume the product in South Carolina."

This case both as to the facts involved and as to the holding is on all fours with the Tri-State Transit Case.

Another case cited is Nashville, C. & St. L. Ry. Co. v. Wallace, 288 U.S. 249, 53 S.Ct. 345, 349, 77 L.Ed. 730, 87 A.L.R. 1191. According to the statement of the case by the court, the railway company purchased large quantities of gasoline outside the State of Tennessee and brought it into the State in tank cars, from which it was unloaded and placed in its own storage tanks. None of it was sold, but all was "withdrawn and used by it as a source of motive power." The court held that the railway company, having imported the gasoline into the State of Tennessee and having there withdrawn it from its tanks to be used by it in its business, was due to pay the tax. The defense in that case was that the gasoline was used for purposes of interstate transportation. But the court held that upon being unloaded and stored the gasoline ceased to be a subject of transportation in interstate commerce and lost its immunity as such from State taxation.

In the case of Edelman, State Treasurer, v. Boeing Air Transport, Inc., 289 U.S. 249, 53 S.Ct. 591, 77 L.Ed. 1155, the defendant was a Washington corporation operating aeroplanes in the State of Wyoming. It imported gasoline into the State of its domicile and from its tanks there transferred it into its aeroplanes. The court held that, inasmuch as the transport company had imported the gasoline to be

used by it in its business, it was due to pay the tax, even though the aeroplanes were used to carry freight and passengers in interstate commerce. It was there held, as in the other cases, that the transfer of the gasoline from the tanks to the vehicles was a use of the gasoline.

The gasoline tax laws involved in the cases decided by the Supreme Court of the United States, like those of Louisiana, require importers of gasoline to pay the tax on fuel imported and used by them in their business. The holding in each of those cases and in the Tri-State Transit Company Case decided by this court is based upon the provisions of the statutes which require those who import motor fuel for their own use, store it in their own tanks and withdraw it therefrom to be used in their business and who do use it, to pay the tax.

In the case at bar the gasoline delivered to Wemple was not imported by defendant, but was manufactured or produced by it, not for sale, but to be delivered to the owner. All the gasoline produced had to be put into the Texas Company's tanks in order to save it and in order that Wemple's part of it might be delivered to him. The withdrawal of the lessor's portion of the gasoline from defendant's tanks was neither a "distribution" nor a "use" of it as contemplated by the statutes, nor was it a sale.

For the reasons assigned, the judgment is affirmed.

PONDER, J., absent.