182 So. 531

**STATE v. STANDARD OIL CO. OF LOUISIANA.**

No. 34779.

May 30, 1938.

Rehearing Denied June 27, 1938.

Gaston L. Porterie, Atty. Gen., James O'Connor, Asst. Atty. Gen., F. A. Blanche, of Baton Rouge, and Hugh M. Wilkinson, L. A. Molony, and E. R. Schowalter, all of New Orleans, for the State.

T. M. Milling, A. M. Curtis, and R. B. Jennings, all of New Orleans, M. J. Wilson, of Baton Rouge, and R. C. Milling, and L. K. Benson, both of New Orleans, for appellee.

ODOM, Justice.

This is a summary proceeding instituted by the State against the Standard Oil Company of Louisiana to collect $566,804.28 alleged to be due as tax on gasoline which the company, as dealer, has sold, used or consumed in the State. To this sum is added $113,360.80 as 20 per cent penalty for delinquency, and $68,016.51 as attorney's fees, making the total amount demanded $748,181.65.

The State is represented by special counsel employed by authority of Act No. 9, Third Extra Session of 1934, which provides that the Governor and the Attorney General may employ attorneys to represent the State in such controversies relating to tax recoveries as they may deem proper.

Plaintiff's petition recites that Act No. 6, Extra Session of 1928, levies a tax of 4¢ per gallon on all gasoline or motor fuel "sold, used or consumed" in the State of Louisiana, and that a like tax of 1¢ per gallon is levied by Act No. 1, Extra Session of 1930, (section 1), which was a joint resolution submitted as a constitutional amendment and adopted in November, 1930, Const.1921, art. 6-A. So that between January 4, 1929, the date on which the first act became effective, and November 27, 1930, when the constitutional amendment, which by its terms was made self-operative, became effective, the company was due the State 4¢ per gallon as tax on all the gasoline it sold, used or consumed in the State, and from the latter date to the date on which the suit was filed (October 29, 1937), the company was due the State a tax of 5¢ per gallon.

It is alleged that during the period beginning January 4, 1929, and ending September 30, 1937, the total amount of gasoline handled by the defendant company as dealer was 442,049,923.7 gallons, and that the tax was paid on only 383,190,104.5 gallons. But it is alleged that the company was entitled to deduct, from the total gallonage handled by it, 46,965,435.5 gallons, on which no tax was due under the law, and therefore the company has accounted for only 430,155,540 gallons, leaving 11,894,383.7 gallons unaccounted for and on

which it is alleged the tax should have been, but was not, paid. Of this 11,894,-383.7 gallons on which it is alleged that no tax was paid, the petition shows that 2,-791,490.1 gallons thereof were handled between January 4, 1929, and November 27, 1930, the period during which a tax of only 4¢ per gallon was due, and that the balance, 9,102,893.6 gallons, was handled between November 27, 1930, and September 30, 1937, the period during which a tax of 5¢ per gallon was due. According to the computation made in the petition, the defendant company is due the total amount claimed, if under the law the State is entitled to judgment.

It is alleged in Paragraph 9 of the petition that: " * *' * during the period from January 4, 1929, through September 30, 1937, the defendant, Standard Oil Company of Louisiana, failed to make proper and correct returns for, and payment to the State of Louisiana of, the full and true amount of gasoline taxes, to the extent hereinafter shown."

And in Paragraph 14 it is alleged that the Collector of Revenue has caused to be made a re-examination of the books, records and files of the defendant company; "And has thereafter corrected the returns of the defendant, Standard Oil Company of Louisiana, for said period, has computed the correct tax due and unpaid, with penalties and attorney's fees, has certified the whole to the Department of Revenue on October 22, 1937, as per the attached duplicate original of said certificate (made part hereof as if set out fully herein) and has concurrently notified the defendant."

In Paragraph 15 it is alleged that special counsel, Hugh M. Wilkinson, wrote the defendant company on March 26, 1937, calling its attention to the alleged discrepancies in its accounts, and in Paragraph 16 it is set out that the special audit referred to in Paragraph 14 was made after March 26, 1937, and that " * * * the auditors on behalf of the State of Louisiana made the audit referred to as the basis of this suit under the observation of the regular auditors of the Standard Oil Company of Louisiana."

In Paragraph 17 it is alleged that the defendant company " * * * is not entitled to any deductions whatever for 'losses in handling' or otherwise; that all of the gallonage of gasoline, amounting to 11,894,383.7 gallons, upon which the tax is claimed herein, was gasoline actually 'sold, used or consumed in the State of Louisiana for domestic consumption,' and accordingly, taxable without exemption or deduction whatever."

Plaintiff prayed for judgment in the amount alleged to be due.

The defendant filed several exceptions, attacked the validity of Act No. 9, Third Extra Session of 1934, under which special counsel was employed, and attacked the contract itself. At the same time, it filed its answer.

In answer defendant denied that it was indebted to the State in any amount. It specifically denied that the returns and payments made by it to the State during the long period beginning January 24, 1929, and ending September 30, 1937, were in-

correct as alleged in Paragraph 9 of plaintiff's petition, and denied that the Collector of Revenue was authorized by law to correct said returns, as alleged in Paragraph 14 of the petition, and "Further answering this paragraph, defendant shows that all of its tax returns over a period from January, 1929, to and including April, 1937, were examined and approved by either the Supervisor of Public Accounts or the Collector of Revenue, and that said Collector of Revenue is now estopped to claim that the said returns were incorrect, as is more fully hereinafter set out."

In Paragraph 18 of the answer, it is alleged that defendant is unable to determine from the petition the ground upon which the suit is brought, for the reason that the same is vague and indefinite, but (Paragraph 19), assuming that the amount of the claim is based upon the 3 per cent deduction, shown on its reports, made from the total gallonage sold, used or consumed, in computing the tax due, it is alleged that said deductions were authorized by the taxing statutes and were correct and had been, through all the years, approved and accepted by the tax-collecting authorities and their auditors. It is alleged that, soon after Act No. 6, Extra Session of 1928, went into effect, E. A. Conway, then Supervisor of Public Accounts, whose duty it was to collect the gasoline tax, prepared and submitted forms on which dealers should make their returns each month, showing the amount of gasoline sold, used or consumed during the previous month, as a basis for computing the tax: that de-

fendant had made its returns on and according to these forms, which returns were approved and accepted by the Collector, and that it has at all times strictly complied with all the rules and regulations made by the Supervisor and paid its taxes accordingly, and that for the tax-collecting authorities now to change their rules and order an accounting on a different basis and make the change retroactive would deprive defendant of its property without due process of law.

From a judgment rejecting its demands and dismissing its suit, the State appealed.

It would subserve no useful purpose to discuss the various exceptions filed by defendant, or the attacks made on the validity of Act No. 9, Third Extra Session of 1934, under which special counsel was employed. The case was decided by the trial judge on its merits and is now before us on its merits.

The issue involved clearly appears from the pleadings. The amount claimed is for back gasoline taxes, levied by Act No. 6, Extra Session of 1928, as amended, and Act No. 1, Extra Session of 1930, approved as a constitutional amendment, article 6-A, §§ 1-14. It is conceded by special counsel employed by the State, who argued the case orally before the court and who appears to be the author of the briefs filed, that the defendant company has paid all the taxes demanded of it by the Supervisor of Public Accounts (now the Collector of Revenue) up to the time this suit was filed. It is further admitted that the defendant made

returns showing the amount of gasoline handled each month on forms prepared and furnished by the Supervisor, and that the returns made by defendant, showing the total amount of gasoline sold, used or consumed by it with 3 per cent deductions therefrom, to serve as a basis for computing the amount of the tax due, were all approved and accepted by the Supervisor and his auditors. It is too clear to admit of doubt that the company paid all the taxes due by it under the acts as interpreted by the collecting authorities.

But special counsel now argues that the Supervisor's original interpretation of the acts, which was reduced to writing and submitted to the tax-payers in the form of a letter dated March 5, 1929—which interpretation was accepted and relied upon by defendant as the correct basis for computing the amount due by it—, was erroneous; that the Supervisor of Public Accounts erroneously advised all taxpayers, including defendant, that as a basis for computing the tax due they were entitled to deduct 3 per cent from the total gallonage sold, used or consumed; and argues that now, since the alleged error has been discovered, the defendant must pay the additional amount due on gasoline previously handled, according to the new or second interpretation given the acts in 1937.

The company admits that it paid no tax on 11,894,383.7 gallons of the gasoline it handled between January, 1929, and September, 1937, the reason assigned being that the gasoline on which it paid no tax was exempt, this quantity being 3 per cent of the total gallonage, which was deducted in accordance with the Supervisor's interpretation of the law and in accordance with his instructions. Counsel for the State admits that the gasoline involved is the gallonage thus deducted. But his contention is that the company "is not entitled to any deductions whatever 'for losses in handling' or otherwise." (Paragraph 17, Petition.)

Referring now to Act No. 6, Extra Session of 1928, as amended, and Act No. 1, Extra Session of 1930, approved as a constitutional amendment, under which gasoline taxes are levied, we find that Paragraph 1, Section 1, of the 1928 act, as amended by Act No. 16 of 1932, § 1, provides:

"That there is hereby levied a tax of four cents (4c) per gallon on all gasoline, or motor fuel, sold, used or consumed in the State of Louisiana for domestic consumption, to be collected as hereinafter set forth."

The second paragraph of Section 1 defines "motor fuel". The third paragraph of that section makes some reference to the product commonly known as "casinghead and absorption gasoline", which is not pertinent here. But the following clause in that paragraph, relating to sales of gasoline, is pertinent. It reads:

"Reports of all such sales shall be furnished to the Supervisor of Public Accounts, with the report required in Section 4 of this Act, and shall show whether the sales were made for blending purposes or for use in motors."

Immediately following the last above quoted clause is Paragraph 4, which reads as follows:

"Provided that an allowance of three per cent of the total gallonage *received* during every calendar month *shall be made and deducted by the dealer to cover his or their losses in handling such motor* [*vehicle*] *fuel* and that a refund shall be made to said dealer for the tax paid on all motor [vehicle] fuel which after such payment shall be lost or destroyed by fire, lightning, flood, tornado, wind-storm, explosion or other accidental or providential cause." (Italics are ours.)

Act No. 1, Extra Session of 1930, § 1, levies a tax of 1¢ per gallon on gasoline in addition to the 4¢ levied by the 1928 act. It is complete in detail and is almost a literal copy of the 1928 act. There is a clause in Paragraph 3, Section 1, relating to reports required of dealers in gasoline like the one in the 1928 act. Then follows immediately a clause providing that "an allowance of *three per cent* of the total gallonage *received* during every calendar month *shall be made and deducted* by the dealer to cover his or their losses in handling such motor vehicle fuel." (Italics ours.)

This clause relating to the allowance and deduction for losses in handling is identical with that in the act of 1928.

It is therefore perfectly clear that the members of the Legislature realized that, in arriving at the gallonage on which the tax should be paid, the dealer in gasoline—

the term "dealer" being defined in the various acts (Section 2, Act 6, Extra Session of 1928; Section 2, Act 1, Extra Session of 1930, adopted as a constitutional amendment, and Section 3, of Act 34 of 1934) as any person, etc., "who produces, refines, manufactures * * * gasoline * * * or other motor fuel for sale to the jobber or consumer"—was entitled to some reduction from the total gallonage handled "to cover his or their losses in handling such motor vehicle fuel", and that they intended to allow some reduction; and clear also that they intended to, and did, fix 3 per cent as the flat amount which should be deducted "by the dealer" from the "total gallonage received during every calendar month".

We are not driven to speculate as to what the Legislature intended. The legislative intent is express. There was never any doubt, apparently, in the minds of the "dealers" or of the Supervisor of Public Accounts, who was charged with the duty of seeing that the tax was collected, that, as a basis for computing the amount of the tax due, a deduction of 3 per cent should be made from the "total gallonage received during every calendar month."

But it appears that, soon after the adoption of the first act, a controversy arose between some of the dealers and the Supervisor of Public Accounts as to the meaning of the word "received" in the clause providing for the deduction. This is shown by correspondence between the attorney for one of the dealers and Mr. Conway, then Supervisor of Public Accounts. Mr. Conway was called upon to give his interpreta-

tion of this particular clause and especially the meaning of the word "received". Mr. Conway's letter to the dealer is in the record. We quote it in full:

"State of Louisiana

"Office of

"Supervisor of Public Accounts

"Baton Rouge, La.

"March 5, 1929

"Louisiana Oil Refining Corporation,

"Shreveport, Louisiana.

"Gentlemen:

"With reference to our correspondence regarding the 3% allowance for losses in handling motor vehicle fuel, and particularly to our letter of February 25, 1929, and reply of your attorney, Mr. H. C. Walker, Jr., under date of February 27th, and confirming conference between the writer, Mr. J. F. Boyle, Assistant Supervisor of Public Accounts, and Mr. H. C. Walker, Jr., held on the evening of March 4th, beg to advise as follows:

"That for the purpose of the 3% allowance under Act 6 of the Extra Session of 1928, the office of the Supervisor of Public Accounts will construe total sales as the equivalent of receipts, and will accept for the purpose of such deduction, reports of total sales as total receipts; that is, you may base your 3% allowance on the total sales for the calendar month (sales and receipts being treated as equivalents).

"There is some difference of opinion as to the meaning and application of Paragraph 4 of Section 1 of Act 6 of the Extra Session of 1928, and under our interpreta-

tion of the Act, it is the desire of this department to collect 4c per gallon on all gasoline, etc., sold, used or consumed in the State of Louisiana, less 3% allowance for losses in handling; and in order to offer you the protection deemed necessary by your attorney, this letter is directed to you at his request.

"Yours very truly,

"E. A. Conway,

"Supervisor of Public Accounts.

"EAC:VP"

Upon receipt of this letter, Mr. Walker, the attorney, answered, saying:

"I have advised that the Louisiana Oil Refining Corporation, until further notice, report and remit to you each calendar month, a four cent. per gallon tax on total gallonage sold, less three per cent. of such gallonage treated as 'receipts' allowed under the act."

A copy of Mr. Conway's letter giving his interpretation of the act was sent to the other dealers, including this defendant, and it is shown that without exception they accepted his interpretation as correct and followed it in making their returns.

Section 4 of the 1928 act, as amended by Act No. 8 of 1930, § 1, and the same numbered section of the 1930 act provide that each dealer shall each month "file with the Supervisor of Public Accounts a statement, under oath, on forms prescribed and furnished by him", of the business transacted during the previous month. Mr. Conway made up and furnished these forms. A photostatic copy of one of them,

filled out, is in the record, and in form is in part as here shown:

"During the Month of ——— 19—

"Sales in the State of Louisiana

| "Kind of Motor Fuel | Total Gallons Sold | State Tax Four Cents Per Gallon |
|---|---|---|
| "Gasoline | | $ |
| "Other Motor Fuel | | $ |
| | | $ |
| "Less Allowance —3% | | $ |
| | | $ |
| "Totals | | $ |

"The allowance of 3% is based on the net taxable gallonage sold, used or consumed in the State."

These forms were used by all dealers, and the returns made on them accepted (barring clerical errors) by the Supervisor of Public Accounts from January, 1929, to September, 1937—nearly nine years. Mr. Boyle, who said he had been connected with the Supervisor's office for fourteen years, testified that Mr. Conway required the dealers to make their returns on these forms. He further testified that this defendant had, from the time the 1928 act went into effect down to the time the case was tried, made its returns on these forms and "paid the tax as required by the forms". He, further said that the company's books and records were checked by the State's auditors to see whether the reports were correct.

Since the adoption of the 1928 and 1930 acts levying the gasoline tax, the Legislature has convened four times in regular session, and there have been numerous special sessions. But there has been no change in legislative intent as relates

to these deductions. This is shown by the fact that the 1928 act has been amended at least four times without any change in the 3 per cent deduction clause. Sections 4, 6, 8 and 12 were amended by Act No. 8 of 1930. Section 1 of the 1928 act was "amended and re-enacted" by Act No. 16 of the Regular Session of 1932. The fourth paragraph of that section as re-enacted reads as follows:

"Provided that an allowance of three per cent of the total gallonage received during every calendar month shall be made and deducted by the dealer to cover his or their losses in handling such motor fuel and that a refund shall be made to said dealer for the tax paid on all motor fuel which after such payment shall be lost or destroyed by fire, lightning, flood, tornado, wind-storm, explosion or other accidental or providential cause."

This provision reads word for word like the one in the original act except, in the fourth line form the top (Official Copy), the word "vehicle" between the words "motor" and "fuel" is left out.

Section 1 was again "amended and re-enacted" by Act No. 34, Regular Session of 1934. The allowance and deduction clause in this act is the same, word for word, as that in the 1932 amendment.

The original act, but not Section 1, was again amended by Act No. 335 of the Regular Session of 1936.

We must assume that the members of succeeding legislatures were aware of Mr. Conway's interpretation of the original act and the manner in which the deal-

ers were making their reports and settlements. And it is certain that as relates to these allowable deductions and the amount thereof there has been no change in legislative intent, for the clause in the original act providing for such deductions was re-enacted in the same words in 1934, more than five years after the first act went into effect and after Mr. Conway's interpretation was promulgated.

We see therefore that the original act which clearly expressed the legislative intent to allow the dealers to deduct 3 per cent "to cover his or their losses in handling" such motor fuel has twice received specific sanction by subsequent legislatures. And it is fair to assume, we think, that these subsequent legislatures intended to sanction Mr. Conway's interpretation of the original act, for it must have been known what that interpretation was.

Furthermore, this "statutory" allowance has received judicial recognition and approval. In State v. Strother et al., 179 La. 354, 154 So. 22, the State sued the defendants to recover a certain amount for taxes on gasoline. In the course of our opinion we said (page 24):

"The importations in question were entitled to, and were credited with a deduction of 3 per cent. to cover 'losses in handling such motor fuel,' as provided by law, which deduction amounted to 10,926 gallons, leaving 353,268 gallons as subject to the tax of 5 cents per gallon."

Further on in the opinion we referred to the "statutory allowance of 3 per cent.". Furthermore, the opinion shows that the State credited Strother with an "allowance of the statutory 3 per cent. deduction". That case was decided February 26, 1934.

In many other cases decided by this court, the record shows that the statement of the account sued on allowed a deduction of 3 per cent. See exhibit itemizing claim in record, case of State v. Texas Co., 187 La. 287, 174 So. 359, decided April 26, 1937.

The clause of the statute allowing the dealers a 3 per cent deduction to cover the losses in handling gasoline is not clear or free from ambiguity. It is somewhat confusing, as Mr. Conway said in his letter dated March 5, 1929. For that reason, the State's administrative officers were called upon to interpret its meaning. The requested interpretation or construction was promptly given, accepted by the dealers without question, and in practice has been followed consistently ever since.

Because of the construction consistently given this statute by the administrative officers whose duty it is, and has always been, to enforce it; because of the repeated re-enactments of the original act without change, and because of the judicial sanction given it, the construction put upon it should not be overturned now so as to affect past transactions unless manifestly wrong.

In McCaughn, Collector of Internal Revenue v. Hershey Chocolate Co., 283 U.S. 488, 51 S.Ct. 510, 75 L.Ed. 1183, Justice Stone, the organ of the court, said (page 512):

"The re-enactment of the statute by Congress, as well as the failure to amend it in the face of the consistent administrative construction, is at least persuasive of a legislative recognition and approval of the statute as construed."

In the same case the court said:

"The provision has been consistently enforced as construed, was re-enacted by Congress in the 1921 Act and remained on the statute books without amendment until its repeal. Such a construction of a doubtful or ambiguous statute by officials charged with its administration will not be judicially disturbed except for reasons of weight, which this record does not present."

In United States v. Jackson, 280 U.S. 183, 50 S.Ct. 143, 74 L.Ed. 361, the United States Supreme Court said (page 146):

"It is a familiar rule of statutory construction that great weight is properly to be given to the construction consistently given to a statute by the Executive Department charged with its administration. United States v. Cerecedo Hermanos y. Compania, 209 U.S. 337, 28 S.Ct. 532, 52 L.Ed. 821; Robertson v. Downing, 127 U.S. 607, 8 S.Ct. 1328, 32 L.Ed. 269; United States v. Healey, 160 U.S. 136, 16 S.Ct. 247, 40 L.Ed. 369. And such construction is not to be overturned unless clearly wrong, or unless a different construction is plainly required. United States v. Johnston, 124 U.S. 236, 253, 8 S.Ct. 446, 31 L.Ed. 389; Hawley v. Diller, 178 U.S. 476, 488, 20 S.Ct. 986, 44 L.Ed. 1157."

This court has consistently recognized and approved this doctrine. In State ex rel. Guillot v. Central Bank & Trust Co., 143 La. 1053, 79 So. 857, 859, we quoted approvingly the following from Sutherland on Statutory Construction, Paragraph 309:

"The practical construction given to a doubtful statute by the public officers of the state, and acted upon by the people thereof, is to be considered; it is perhaps decisive in case of doubt. This is similar in effect to a course of judicial decisions. The Legislature is presumed to be cognizant of such construction, and after long continuance, without any legislation evincing its dissent, courts will consider themselves warranted in adopting that construction."

See, also, State v. Comptoir National D'Escompte de Paris, 51 La.Ann. 1272, 26 So. 91.

In St. Bernard Syndicate v. Grace, 169 La. 666, 125 So. 848, we said (page 850):

"The courts are reluctant to overrule a long-standing construction placed on a statute by administrative officers charged with its execution and enforcement, and will not do so unless such construction is arbitrary and manifestly against the letter and spirit of the statute."

To the same effect are the cases of Dominion Land Co. v. Stark, Tax Collector, 156 La. 124, 100 So. 244; State v. Young, 137 La. 102, 68 So. 241; State ex rel. Payne, Tax Collector v. Exchange Bank, 147 La. 25, 84 So. 481.

In the case of State v. Standard Oil Co. of Louisiana, 188 La. 978, 178 So. 601, the rule or doctrine of contemporaneous or administrative construction of a statute was invoked by the defendant without success. We held that the doctrine was not applicable in that case (1) because the statute involved was plain and without ambiguity, and (2) because the administrative officers of the State had no knowledge of the defendant's method of computing the tax until its books were audited. In the course of our opinion we said (page 605):

"Executive construction cannot change the plain language of a statute."

In support of that statement we cited a long list of cases decided by the Supreme Court of the United States, and the case of Penick & Ford v. Ehret, 166 La. 1, 116 So. 572, decided by this court.

The case at bar is distinguishable from State v. Standard Oil Co. of Louisiana, supra, for two reasons. The first is that the meaning of the particular clause of the statute involved in this case is not plain but is somewhat ambiguous. The second is that the administrative officers of the State interpreted the statute here involved soon after its adoption and specifically prescribed the method of computing and collecting the tax, and of course had knowledge that this method was consistently employed thereafter by defendant.

Our view is that this doctrine or rule is applicable and should be followed by us in this case.

The argument made by counsel for the State is that Mr. Conway's construction of the statute was clearly wrong and that a different construction was plainly required. His view is that the provision for the 3 per cent deduction to cover losses in handling has reference to "prospective losses" up to, but not exceeding, 3 per cent—in other words, that the dealers are entitled to credit for such losses in handling as they may actually sustain and no more.

There may be room for this argument, but we think it is unsound. Our opinion is that the construction given the statute originally by the administrative officers of the State is correct. In the first place, if such had been the legislative intent, words could, and no doubt would, have been found and used to express that intent. Aside from this, however, the wording of the statute, we think, refutes the argument. It says that an allowance "of three per cent of the total gallonage received during every calendar month shall be made and deducted". The deduction is made from the amount "received." Each of the gasoline taxing statutes clearly shows that the intent of the Legislature was that the tax be paid by those who handle this commodity originally and before it goes into commerce.

Section 2 of the 1928 act and the same numbered section of the 1930 constitutional amendment provide that the tax "shall be collectible from all persons, firms or corporations or associations of persons, engaged as dealers in the handling, sale or distribution of such products". The term "dealer" is defined in the same section to be "any person, firm, corporation or association of persons, *who produces, refines,*

*manufactures, blends or compounds gaso-line or motor fuel* for sale to the jobber or consumer, or to the persons, firms, corporations, or associations of persons who, in turn, sell to the jobber or consumer". The term "dealer" is further defined in the acts to mean persons, firms, etc., importing "such gasoline or motor fuel from any other State or foreign country for distribution, sale, or use in the State of Louisiana". (Italics are ours.)

Section 6 of the same acts, as amended, provides:

"It is the purpose of this Act to centralize the collection of the tax herein authorized in the hands of those who *originally* dispose of gasoline or motor fuel for distribution and consumption within this State." (Italics are ours.)

In other words, the tax must be paid at the source and must be paid before the commodity is moved. Section 4 of the original act was amended by Act No. 8 of 1930, § 1, the amendment going into effect on July 30 of that year. That section as amended provides that a person, firm or corporation engaged as dealer in the handling or distribution of gasoline " * * * shall *immediately* upon the producing, refining, manufacturing, blending or compounding of any gasoline or motor fuel pay to the Supervisor of Public Accounts the tax levied herein, which is hereby made due and payable immediately upon said producing, refining, manufacturing, blending or compounding." (Italics are ours.)

It is further provided in that section that any dealer bringing gasoline or motor fuel into the State of Louisiana for sale, use or consumption therein " * * * shall immediately pay to the said Supervisor of Public Accounts the tax levied herein which is hereby made due and payable immediately upon same coming within the boundaries of this State."

This same requirement as to the immediate payment of the tax is found in all the subsequent statutes. The meaning is that the commodity cannot be moved by the dealer until the tax has been paid.

The deduction of 3 per cent is made at the time the tax is paid, and the tax is paid "immediately" upon the production, refining or blending of the commodity, and, in case it is imported, "immediately upon same coming within the boundaries of this State".

It is certain, we think, that the Legislature did not contemplate that any future adjustment to cover "losses in handling" should be made. The taxes are paid at the source, and "immediately"; the adjustments for losses, the deductions, are also made at the source, and immediately. The acts make no provisions for such future adjustments. No method is prescribed for ascertaining the actual amount of future losses.

Whether the members of the Legislature had in mind "prospective losses" is beside the question. It is certain that they intended to allow some reduction. The amount of the losses contemplated may

have been an estimate, which was either too high or too low. Certainly it was within their discretion to make an estimate of such losses as they had in mind and to fix the amount at a flat or arbitrary figure, if they saw fit to do so; and that is precisely what was done.

The reason why this was done may well be imagined. It was evidently to the advantage of the State, if deductions were to be made at all, to have the adjustment for such losses made once and for all at the source and at the time the taxes were paid. This method obviated the necessity for future checking and accounting in order to ascertain actual losses. The members of the Legislature no doubt foresaw that, if the matter of adjustment was left open for future determination, there would be disputes and controversies between the dealers and the administrative officers as to the exact amount of the losses sustained, and that the expense of following up the commodities and checking would be so great that any other method than the one adopted would be wholly impracticable.

But whatever may have been the reason for adopting this method of settlement, the fact remains that the Legislature did adopt it, and it is significant that, whereas the acts are replete with provisions authorizing and directing the Supervisor of Public Accounts (now Collector of Revenue) to check and audit the books and accounts of the dealers for other purposes, yet nothing is said about his checking their accounts in order to ascertain what counsel refers to as "prospective losses" in handling.

It is argued that, while the dealer in gasoline is made primarily responsible for the tax, yet the tax is in reality paid by the consumer and not by the dealer, and that the dealers are tax collectors and not taxpayers. In support of this argument the State offered in evidence invoices sent out by the defendant to filling station operators, showing the tax as a separate item. There were also introduced photographs of placards displayed at these filling stations showing the segregation of the tax from the price of gasoline. The intended purpose of these offerings was to show that the tax is collected from the consumer when the commodity is sold at retail. It is said in brief that the dealers collect the tax from the consumers and remit it to the State.

This argument is made in connection with counsel's claim that there is evidence in the record to show that in practice the actual loss in handling gasoline amounts to less than the 3 per cent with which the dealers are credited at the source, and that to permit the dealers to collect and retain more than the actual losses amount to is unjust both to the State and to the consuming public.

If, as contended by counsel for defendant, the gasoline tax levied by the statutes is an excise and not a property tax, and the State has collected from the dealer at the source the full amount of the tax levied, the question whether the dealer's losses in handling have actually been less than the statutory allowance of 3 per cent is one in which the State has no interest and with which it has no con-

cern. If in fact the dealer has reaped some advantage as a result of the statutory allowance of 3 per cent to cover losses in handling, the State cannot now complain, because it has not been injured, having received all it claimed.

The contention now made by counsel for the State that the gasoline tax is a "consumer tax" paid by the consuming public and that the dealers are tax collectors and not taxpayers, is in the teeth of all the statutes and contrary to numerous decisions of this court and recent decisions of the Federal courts. It is not consistent with the position formerly taken by the Attorney General.

The statutes specifically provide that every person engaged as "dealer" shall "immediately upon the producing, refining, manufacturing, blending or compounding of any gasoline or motor fuel pay to the Supervisor of Public Accounts the tax levied herein".

In State v. Johnson, 173 La. 669, 680, 138 So. 503, we said, in speaking of the gasoline tax (page 506):

"This is an excise, not a property, tax. The tax is laid, not upon the gasoline, but upon the right or privilege of selling, using, or consuming it; the amount to be paid being based upon the quantity involved."

In State v. Tri-State Transit Co., 179 La. 811, 155 So. 233, we said (page 237): "The tax sued for is an excise tax."

In State v. City of Monroe, 177 La. 983, 149 So. 541, in speaking of the gasoline tax, we said (page 543):

"The tax herein involved is clearly a tax upon the sale, distribution, or use of the gasoline. It is therefore an excise tax."

In many other cases which might be cited the holding of this court was the same.

The case of Trinityfarms Construction Co. v. Grosjean, D.C., 3 F.Supp. 785, was one where the State sued the defendant to collect an amount alleged to be due for taxes on gasoline. In that case the court said (page 787):

"The tax which plaintiff is called upon to pay is an excise and not a property tax, the tax being laid not upon the gasoline but upon the right or privilege of selling, using, or consuming it."

The case was appealed to the Supreme Court of the United States and is reported in 291 U.S. 466, 54 S.Ct. 469, 78 L.Ed. 918. The Supreme Court said:

"The state Supreme Court has held that the exaction is an excise tax levied upon all gasoline or motor fuel sold, used or consumed in the state (State v. Tri-State Transit Co., 173 La. 682, 138 So. 507), and we accept that characterization."

█ The fact that the retail dealer collected the amount of the tax as a special item from those who purchased gasoline at filling-stations does not necessarily indicate that this defendant considered the tax as a "consumer" and not as an excise tax, and does not estop it from now claiming that the tax is in fact an excise tax.

In practice the retail dealers merely added the amount of the tax to the price of the

gasoline, or "passed it on" to the consumer. That is the practice of all dealers in cases of this kind. In State v. Wilson & Co., 179 La. 648, 154 So. 636, 638, the court had occasion to discuss the question whether a franchise tax is in fact a consumer tax when the amount of the tax is "passed on" to the consumer. In speaking of the tax, this court said (page 638):

"The tax is laid on the manufacturer, wholesaler, or jobber, and remains on him. It does not pass to the purchaser of the merchandise, although incorporated in the bill to him, whether it appear on the bill separately or not. The purchaser does not pay the tax, although he may pay the vendor more for the goods, because of the vendor's obligation to pay it, but that is all."

We cited the case of Lash's Products Co. v. United States, 278 U.S. 175, 49 S.Ct. 100, 73 L.Ed. 251, in which the Supreme Court of the United States was considering a manufacturer's tax. The court said, through its organ, Mr. Justice Holmes:

"The phrase 'passed the tax on' is inaccurate, as obviously the tax is laid and remains on the manufacturer and on him alone. Heckman & Co. v. I. S. Dawes & Son Co., 56 App.D.C. 213, 12 F.2d 154. The purchaser does not pay the tax. He pays or may pay the seller more for the goods because of the seller's obligation, but that is all."

The fact that this defendant required operators of its filling stations to post notices showing a segregation of the price of gasoline from the tax cannot be construed as shifting the tax from the dealer to the consumer, because, as a matter of law, the dealer is required to pay the tax. The posting of such notices was merely a matter of business practice which could not affect the law.

There is testimony indicating that the fixing of a flat 3 per cent deduction to cover the dealer's losses in handling has resulted advantageously to the dealers. Mr. Hagaman, Comptroller of the Standard Oil Company of Louisiana, who was a witness for defendant, said that the company kept no data and made no calculation showing the exact amount of its losses in handling. He said, however, that in one study the loss on all products handled was estimated at 2½ per cent.

As we have said, the State, having fixed 3 per cent as the amount to be deducted and apparently being satisfied with the arrangement made with the dealers, cannot be heard to complain now.

For the reasons assigned, the judgment is affirmed.

HIGGINS, J., concurs in decree for reasons assigned.

FOURNET, J., concurs in the decree.

PONDER, J., concurs.

HIGGINS, Justice (concurring in the decree).

I concur in the decree solely on the ground of contemporaneous construction, the State having received the amount of

taxes it claimed under the law through its duly authorized officer, but this conclusion is not to be construed as condoning or approving the practice of oil dealers charging to the consuming public a greater amount of taxes than those remitted to the State. I do not think that the Legislators in enacting the statutes, or the Supervisor of Public Accounts, in interpreting them, ever contemplated that the oil dealers, who paid the taxes to the State as a matter of practicability in their collections, would collect from the retail purchasers and consumers of gasoline taxes in excess of those paid to the State so that at the end of the fiscal year the dealer's books would show a net income, not only from the sale of merchandise, but from gasoline taxes collected as such from the consumers, for example, in this case the Company's records show a net income from allowance on State gasoline taxes of $86,572.37 for the year 1936, $71,581.27 for the year 1935, and a similar amount for the year 1934. The allowance of 3 per cent was for loss, wastage and destruction but not an allowance of 3 per cent from actual gasoline taxes collected from the public.

It was shown that the gasoline or oil dealers annually pay to the State approximately $10,000,000 in gasoline taxes, but collect in return from the consuming taxpayers the sum of approximately $10,300,000 and, therefore, retain approximately $300,000 more than they pay to the State. Surely, this method of handling the gasoline taxes was never authorized by the Legislature or the Supervisor of Public Accounts of the State of Louisiana.