196 So. 349

STATE v. SINCLAIR REFINING CO.

No. 35371.

Jan. 9, 1940.

Rehearing Denied May 8, 1940.

Lessley P. Gardiner, Atty. Gen., and E.
L. Richardson, Justin C. Daspit, and F. A.

Blanche, Sp. Assts. Atty. Gen., for the State.

Roy T. Osborn, of New York City, V. R. Tomlinson, of St. Louis, Mo., and Porteous, Johnson & Humphrey, of New Orleans, for defendant-appellee.

ODOM, Justice.

This is a summary proceeding brought by the State, under Act 14, Second Extra Session of 1935, against the Sinclair Refining Company, engaged in this state as a "dealer" in gasoline, kerosene, and petroleum products. The total amount claimed by the State is $135,758.36, with interest from the time of judicial demand, plus 10 per cent attorney's fees.

The demand was made after the State audited defendant's books and accounts, the audit covering a period beginning January 1, 1935, and ending June 1, 1938. The State alleged that during that period the defendant imported into this state for sale, use, or consumption, 1,591,862 gallons of gasoline, or a total gallonage, after deducting the statutory 3 per cent "for losses in handling", of 1,544,105 gallons, on which it had not paid the tax at the rate of 5¢ per gallon, this tax amounting to $77,205.27. The State alleged further that the defendant should have paid, but did not pay, the parish tax of 2¢ per gallon on 699,922 gallons, the tax amounting to $13,998.46; that defendant is due an inspection fee of ⅟₃₂ of 1 cent per gallon, amounting to $497.45, making a total claim of $91,701.18, plus 20 per cent penalty amounting to $18,240.75, and plus 10 per cent attorney's fees on the total amount due.

In addition to this amount, the State demanded $24,580, representing a penalty of 20 per cent for delinquency on $102,802.75, this being the amount of the tax on 2,056,054 gallons of gasoline sold by defendant to the Pan-American Corporation, which amount of tax it is alleged was not timely paid according to the requirements of the statutes, together with 10 per cent attorney's fees. The State claims further $1,235.75, with 10 per cent attorney's fees thereon, representing tractor fuel refunds which were disallowed for the period from June 1, 1936, to June 1, 1937, there being 102,979 gallons involved.

As to what may be referred to as the State's principal demand, which was for the amount of the tax on gasoline, defendant in its answer denied liability. It alleged that, during the period covered by the State's audit, it imported through its terminal at Westwego, this state, 177,451,523 gallons of gasoline, and imported to its other places of business in the state 11,697,644 gallons, or a total of 189,149,167 gallons; that of this gallonage it exported interstate 133,485,334 gallons; that it shipped intrastate from its Westwego plant to its bulk stations in Louisiana 41,663,590 gallons; that it purchased from other bonded dealers in this state 14,262,851 gallons.

But defendant alleged that, after taking into consideration its inventories of the amount on hand at Westwego and its bulk plants, there was a shortage in its stock on hand, out of the whole quantity handled, of 1,646,551 gallons, and it is alleged that this shortage was due to divers and sundry losses of gasoline in handling, storage, and

shipment, and alleged that such losses occurred in such manner and under such circumstances that the gasoline could not have been sold, used, or consumed in the state. In other words, the defendant claimed credit for this shortage.

Defendant further alleged that it had posted a surety bond with the Collector of Revenue, and that, because it had done so, it was not required, by the various statutes providing for the levy and collection of taxes on gasoline and certain mentioned petroleum products, to pay said taxes on any of the gasoline and other products mentioned except such gallonage as was actually sold, used, or consumed in the state, and that it was relieved of the obligation to pay taxes on gasoline or motor fuel immediately upon its importation, manufacture or compounding within the state; that the statute as relates to bonded dealers provides that they shall report and pay taxes upon the 20th day of the month succeeding the month in which the sale, use, or consumption takes place. In other words, the contention of the defendant, as set up in its pleadings, is that, because it has furnished the bond required by the statutes, it is not required to pay the tax immediately after the gasoline or other motor fuel is received into the state, but is permitted to delay payments until such fuel or products are actually sold, used, or consumed in the state, and is required to pay the tax on only such products as are actually sold, used, or consumed.

Before answering to the merits, the defendant filed an exception of no cause or right of action, a plea to the jurisdiction of the court ratione materiae, and attacked the constitutionality of Act 14, Second Extra Session of 1935. These exceptions were overruled by the trial judge on the ground, as stated by him in his written opinion, that they "are substantially the same exceptions that were filed by the defendant in the suits entitled State of Louisiana v. Standard Oil Company of Louisiana, reported in 188 La. 978, 178 So. 601; and [Id.], 190 La. 338, 182 So. 531, respectively".

There was judgment overruling all exceptions and pleas filed by the defendant, and upholding the validity of Act 14, Second Extra Session of 1935, and judgment in favor of the State, and against the defendant, as follows:

"(1) For the tax, penalty and attorney's fees at the rate of seven cents (7¢) per gallon on 1,666 gallons of gasoline, plus penalty for delinquency thereon at the rate of 20%, and 10% additional as attorney's fees on both the tax and penalty amounting to the total sum of $153.93, which amount represents gasoline which was sold, used or consumed by the Defendant, and upon which no tax has been paid.

"(2) In the sum of $11,913.95, representing 20% penalty on $59,569.75, the tax which the defendant should have paid the State on 1,191,395 gallons of gasoline sold to the Pan-American Petroleum Corporation at the rate of five cents (5¢) per gallon; in the sum of $2,799.68, representing 20% penalty on the parish tax on 699,922 gallons of gasoline at two cents (2¢) a gallon, and the additional sum of 10% attorney's fees on the above two amounts, all amounting to the sum of $16,184.99.

"(3) In the sum of $611.51, being the tax due on 61,151 gallons of tractor fuel or kerosene at the rate of one cent (1¢) per gallon; in the sum of $122.30, representing the penalty for delinquency thereon at the rate of 20%; and in the sum of $73.38, representing attorney's fees on the aggregate amount of tax and penalty, which tax and penalty amount to the sum of $733.81, or the total sum of $807.19, representing the tax, penalty and attorney's fees on the tractor fuel or kerosene.

"(4) It is further ordered, adjudged and decreed that the State do have and recover legal interest on the above amounts from the date of judicial demand until paid, and that the defendant pay all costs of this suit.

"(5) It is further ordered, adjudged and decreed that in all other respects the demands of the State be, and the same are hereby denied and rejected."

We shall not discuss the ruling of the trial judge holding that Act 14 of the Second Extra Session of 1935 is constitutional further than to say that his ruling was correct. The attacks made on the validity of that act in this case are the same, or practically the same, as those made in the case of State of Louisiana v. Standard Oil Company of Louisiana, 188 La. 978, 178 So. 601, where it was held that the act is constitutional. We adhere to our holding in that case that the statute is constitutional.

The exception of no cause of action urged is levelled at the proposition that the State, through its proper officers, did not comply with Section 7, Act 6, of the Extra Session of 1928, before filing suit. That

section of the statute provides that the Supervisor of Public Accounts (now the Collector of Revenue) shall have power to require dealers in gasoline, or other motor vehicle fuel, to furnish additional information deemed necessary for the purpose of collecting the tax, and shall have authority to examine the books, records, and files of such dealers, and authority and power to examine witnesses in order to ascertain whether such dealers in making their reports have complied with the statute; and provides further that, if the Collector of Revenue is not satisfied, after making the examination, that the reports are correct and have been made according to law, he shall correct the return and shall compute the tax as in his judgment it should have been computed by the dealer, and shall certify the correct amount as found by him to his department, and "shall concurrently notify such person, firm, corporation or association of persons of such facts"; and, in the event such dealer shall not within five days after such notification "make a correct return and pay the full amount due", the Collector of Revenue shall bring suit in the name of the State to collect the correct amount from such dealer, with penalties.

Counsel for appellant pointed out that, in the case of State of Louisiana v. Standard Oil Company, 188 La. 978, 178 So. 601, it was said by this court that the provisions of Section 7 of the act were complied with, and it is argued that the court held in effect that the statute in this respect must be complied with; otherwise the State would have no cause or right of action to proceed against an alleged delinquent dealer.

What we said in that case about the requirement of this section of the statute was in connection with what the State alleged. We did not hold, or intend to hold, that a literal compliance, under all circumstances, with that section of the statute was necessary in order that the State have a standing in court in a case of this kind. While we do not intend to absolve the Collector of Revenue from the duty imposed upon him by this section of the statute, we do hold that, under the circumstances shown to exist in this case, the exception of no cause or right of action, based solely on the fact that the Collector of Revenue did not submit to the defendant a corrected statement of the amount of the tax which he found due, should not be sustained.

The record shows that there was a dispute between the State and the defendant as to the correct amount due. The State made a complete audit of the defendant's records, and the defendant knew what the purpose of that audit was. The defendant knew that the State claimed that it should pay the tax on the total amount of gasoline manufactured or imported into the state for sale, use, or consumption, less the statutory 3 per cent for losses in handling. The contention of the defendant is, and always was, that it was entitled to deduct the statutory 3 per cent and then pay the tax only on such quantity of gasoline and other products as were actually sold, used, or consumed in the state. The controversy between the State and the defendant revolved mainly around the method of computing the tax. Therefore, it would have been a vain and useless procedure for the State to have submitted to the defendant what the statute refers to as a corrected report. The defendant does not now claim that it would have acceded to the State's demand if it had been made. In fact, the defense made in this case clearly shows that it would not have done so.

The record shows that defendant had ample time after the institution of this suit to prepare for and make its defense. Its constitutional rights have not in any sense been invaded. Our opinion therefore is that the exception of no cause or right of action was properly overruled by the trial judge.

The main issue involved is whether the defendant is due the amount of tax on gasoline which the State claims. Whether it is due the State the amount claimed depends upon the question whether or not the dealer must pay the tax on the total quantity of gasoline manufactured or imported into the state for sale, use, or consumption therein, less the statutory 3 per cent deduction for losses in handling, or whether he is required to pay the tax on the amount of gasoline actually sold, used, or consumed, less the statutory 3 per cent to cover his losses in handling. Counsel for the State say in their brief that the short question the court is called upon to answer is this: "Does the Gasoline Tax Law (Act 6 Ex. Sess.1928, as amended, and Act 1 Extra Session 1930 [article 6-A, Const.1921, added]) authorize the dealer to deduct for stock losses or evaporation in addition to the 3% allowance provided by the statute to cover 'losses in handling'? What losses does the phrase 'losses in handling' include and cover?"

The trial judge in his written opinion stated the main issue involved as follows: "The plaintiff's contention is that the tax is due and payable by the 'dealer' on every gallon of gasoline he brings into the State for sale, use or consumption in the State, less 3%, regardless of how much is lost by evaporation, shrinkage or leakage, whereas the defendant claims that the tax is due only upon that quantity of gasoline imported into the State that is actually sold, used or consumed, less the statutory deduction of 3%."

Section 1, Act 6, Extra Session of 1928, which section has twice been amended (Act No. 16 of 1932, § 1; Act No. 34 of 1934, § 2), levies a tax of 4¢ per gallon on all gasoline or motor fuel sold, used, or consumed in the state for "domestic consumption", the same to be collected as the act in other sections provides. Section 1 of the act contains this provision: "Provided, that an allowance of three per cent of the total gallonage *received* during every calendar month shall be made and deducted by the *dealer to cover his or their losses in handling such motor fuel.*"

That section further provides that: "a refund shall be made to said dealer for the tax paid on all motor fuel *which after such payment* shall be lost or destroyed by fire, lightning, flood, tornado, wind-storm, explosion or other accidental or providential cause." (Italics ours.)

Act 1, Extra Session of 1930, which was adopted as a constitutional amendment and is written in full into the Constitution as Article VI-A, levied an additional tax of 1 cent per gallon on all gasoline, benzene,

naphtha, or other motor fuel, as defined in the act, when sold, used, or consumed in the State of Louisiana, for the benefit of education and the ports of New Orleans and Lake Charles.

Section 1 of this act, like Section 1, Act 6, Extra Session of 1928, provides that an allowance of 3 per cent "of the total gallonage *received* during each calendar month" shall be made and deducted by the dealer "to cover his or their losses in handling such motor vehicle fuel", and that a refund shall be made to such dealer or dealers for the tax paid on motor vehicle fuel, which "after such payment" shall be lost or destroyed by fire, lightning, flood, tornado, explosion, windstorm, or other accidental or providential causes. This particular provision is the same, word for word, as that contained in the 1928 act. Section 1 of the 1928 act was amended and reenacted by Act 16 of the Regular Session of 1932, and the clause in the amending act relating to the 3 per cent allowance is a verbatim copy of that in the 1928 act. Section 1 of the original act was again amended by Act 34 of the Regular Session of 1934, but no change was made in the 3 per cent deduction clause.

The trial judge, commenting on these clauses in the acts referred to, said: "It is very true that this proviso uses the words 'their losses in handling' in referring to the 3% allowance, yet, in view of all the decisions of the appellate courts with respect to this allowance clause, I am of the opinion that these words are not to be literally construed. On the contrary, I am of the opinion that the 3% referred to is an arbi-

trary deduction only and has no relation to losses actually sustained in handling. In other words, that the legislature adopted a purely arbitrary method of taxation, that is, by levying the tax upon 97% of the amount of gasoline sold, used or consumed instead of upon all of the gasoline sold, used or consumed. If in doing this the legislature, in effect, made a 'donation' to the gasoline 'dealers', it is the duty of the legislature and not of the Courts, to revoke the so called donation."

Entertaining such view, the judge ruled against the State and in favor of the defendant on the main issue involved.

It is true, as the judge said, that the Legislature did, in fixing the gallonage of motor vehicle fuel on which the tax should be paid by the dealers, make an arbitrary or flat deduction of 3 per cent from the amount received by them for sale, use, or consumption in the state. The result is that the dealers are required to pay the tax, not on 100 per cent of the gallonage received, but on only 97 per cent of it. But the 3 per cent deduction is an "allowance" and not, in effect, a donation to the dealers.

██ No one has suggested any reasons, and none can be found in the statutes themselves, nor can we think of any, why the law-makers should have intended to make an out-right donation to the dealers of the tax on 3 per cent of the total gallonage of motor vehicle fuel received by them for sale, use, or consumption in the state. Conceding that the Legislature had the right, if it saw fit, to levy the tax on only 97 per cent of the gallonage received by the dealers and thereby, in effect, donate to them

the tax on the remaining 3 per cent, the question why it should have done so naturally arises. We cannot hold that the Legislature did intend this arbitrary deduction to be, in effect, a "donation" without assigning some reason to support the holding. Since we are unable to assign a reason for so holding, we must interpret the statute to mean what it says, and that is that the 3 per cent deduction was intended to cover the dealer's losses in handling.

There was a reason for making a 3 per cent deduction, and the reason is found in the language of the statutes; and there was a reason for making the "allowance" for the purpose stated.

Motor vehicle fuel, especially gasoline, cannot be handled without losses from various causes, such as leakage, spillage, and evaporation. The history of the controversy leading up to the inclusion of the 3 per cent deduction clause in the statutes is a matter of common knowledge. The "dealers", as that term is defined in the statutes, contended, and the Legislature conceded, that they were entitled to some deduction or allowance for their unavoidable losses in handling, and the amount of the allowance was agreed upon and written into the act.

The original act was adopted on December 18, 1928. In the month of March of the following year, there was some correspondence between Mr. Conway, then Supervisor of Public Accounts, and the attorney for one of the major dealers of the state, as to the correct method of computing the tax. Mr. Conway's letter to the attorney was copied by us in State v. Standard Oil Co., 190 La. 338, 351, 182 So. 531,

535. In Mr. Conway's letter, he referred to the 3 per cent as an "allowance for losses in handling motor vehicle fuel". We have been called upon on numerous occasions to interpret the so-called gasoline tax statutes, and, taking cognizance of our own opinions, we know that never before has it been contended by any of the dealers that the 3 per cent "allowance" was intended to be, or that it was in effect, for a purpose other than to cover their losses in handling.

The very able trial judge, after expressing doubt as to the correct interpretation of the provisions of the various gasoline tax statutes relating to the correct method of computing the amount of the tax, said: "It is to be hoped that at the final termination of this case the tax collecting authorities, as well as the gasoline tax payers will be enabled to know beyond any doubt whether or not the 'dealer' in gasoline must pay the tax, (less the 3% deduction allowed under the statute) upon gasoline imported into this State for sale, use or consumption in this State or upon gasoline actually sold, used or consumed in the State."

We intended to, and thought we did, make this point clear in our opinion in the Standard Oil Company case, reported in 190 La. 338, 182 So. 531. Evidently we failed, because there is still confusion and doubt. So, in order to remove doubt as to our interpretation of the meaning of the various provisions of all the statutes relating to the payment of the tax and the method of computing the amount of it, we now hold that "dealers" (as defined in the acts) in gasoline or other motor vehicle fuel must pay the tax on the total gallonage manufactured or imported into this state for sale, use, or consumption therein, less the 3 per cent which the statutes allow dealers to deduct to cover their losses in handling such motor vehicle fuel. In other words, the dealers must pay the tax on 97 per cent of the total gallonage manufactured or imported into the state for sale, use, or consumption in the state, and not on the gallonage actually sold, used, or consumed.

We have reached this conclusion after a most careful study and consideration of each and every one of the so-called gasoline tax acts. It is true, we think, as Judge Borah stated in his opinion in the case of Texas Co. v. Wilkinson et al., D.C., 21 F. Supp. 771, that some of the acts are not as artistically drawn as they might have been. The text of some of them is not free from all ambiguity. The meaning of some of the clauses is dubious. But, adhering to the rule for the application and construction of laws laid down by the Revised Civil Code in Articles 16, 17, and 18, we have, without serious difficulty, reached the conclusion expressed above. Article 16 of the Code reads as follows: "Where the words of a law are dubious, their meaning may be sought by examining the context with which the ambiguous words, phrases and sentences may be compared, in order to ascertain their true meaning."

And Article 17 says: "Laws in pari materia, or upon the same subject matter, must be construed with a reference to each other; what is clear in one statute may be called in aid to explain what is doubtful in another."

We have construed each act as a whole and the different acts with reference to one another. Where words and phrases of dubious meaning were found, we have examined the context, compared the phrases and sentences, all for the purpose of ascertaining the legislative intent as to the method of computing the amount due. We have considered the "reason and spirit" (Civil Code, Article 18) of the acts, especially the clauses making an allowance of 3 per cent of the gallonage "received", to be made and deducted by the dealer "to cover his or their losses in handling such motor vehicle fuel", and those relating to the method of computing the amount due.

When thus construed, it manifestly appears that the Legislature intended the 3 per cent deduction to be an "allowance" (that is the word used) to "cover" the dealer's entire "losses in handling".

It must be noted that the law-maker used the word "cover", which as here used, was evidently intended to mean "To extend over; to be sufficient for; to comprehend, include or embrace; to account for or solve; to counterbalance" (Webster's New International Dictionary); or, as defined in the Century Cyclopaedia and Dictionary, Volume II, "To be equal to, be of the same extent or amount, be coextensive with; as 'the receipts herein cover the expenses'; to counterbalance; compensate for; as, 'to cover one's loss' ".

Section 1 of the statute, as finally amended by Act 34, Regular Session of 1934, provides that this 3 per cent deduction is to be made from "the total gallonage received during every calendar month".

This means that the deduction must be made from the total amount of the dealer's receipts and not from the total amount of his sales, as counsel for defendant argue.

As we have already stated, the members of the Legislature realized that dealers were entitled to some deduction to cover their losses in handling. They evidently thought that an allowance of 3 per cent would be fair to both the State and the dealers, because they wrote that percentage into the law. Whether that percentage was a mere estimate, or whether it was based on data showing the experience of dealers in handling gasoline or the experience of other states where a similar tax had been levied at that time, we do not know. But the fact is that they adopted that percentage and wrote it into the act. It was a flat allowance to cover the dealer's losses in handling. It may have been too high or too low. If it was too high, the State lost and the dealers gained, and, if it was too low, the dealers lost and the State gained. As a matter of fact, the allowance seems to have been too high. In the Standard Oil Co. case, reported in 190 La. 338, 182 So. 531, it was admitted that the dealer's losses in handling were less than 3 per cent. (See concurring opinion of Justice Higgins.) In the case at bar, defendant's losses in handling, according to the brief of its counsel, were much less than 3 per cent. We quote from page 30 of counsel's brief: "The average loss at Westwego from all causes including evaporation, temperature changes, spillage and leakage showed an average loss of $91/100$ of 1%. * * * The average loss of everything in Louisiana, including bulk stations and Westwego is $8/10$ of 1%."

But the State seems to be satisfied with the bargain it made with the dealers. The original act containing the 3 per cent allowance clause was adopted in 1928. Section 1 of that act has been amended several times, the last amending act being Act 34 of 1934. But there has never been any change in the 3 per cent deduction clause or in the wording of the statute as to the purpose for which the allowance was made.

There was a reason for making this flat deduction. In commenting on this clause of the statute and the reason for such a deduction, we said in the Standard Oil Co. case last above cited:

"The reason why this was done may well be imagined. It was evidently to the advantage of the State, if deductions were to be made at all, to have the adjustment for such losses made once and for all at the source and at the time the taxes were paid. This method obviated the necessity for future checking and accounting in order to ascertain actual losses. The members of the Legislature no doubt foresaw that, if the matter of adjustment was left open for future determination, there would be disputes and controversies between the dealers and the administrative officers as to the exact amount of the losses sustained, and that the expense of following up the commodities and checking would be so great that any other method than the one adopted would be wholly impracticable.

"But whatever may have been the reason for adopting this method of settlement, the fact remains that the Legislature did adopt it, and it is significant that, whereas the acts are replete with provisions authoriz-

ing and directing the Supervisor of Public Accounts (now Collector of Revenue) to check and audit the books and accounts of the dealers for other purposes, yet nothing is said about his checking their accounts in order to ascertain what counsel refers to as 'prospective losses' in handling."

One of the arguments made by counsel for the State in that case was that the provision for the 3 per cent deduction to cover losses in handling had reference to "prospective losses" up to, but not exceeding, 3 per cent, and that the dealers were entitled to credit for such losses in handling as they may have actually sustained, and no more. We there rejected that theory, holding that the Legislature did not contemplate that any adjustment to cover losses in handling should be made, except the flat allowance of 3 per cent for that purpose.

In counsel's supplemental brief, they say that defendant does not contend "that the State did not have the right to levy a tax based upon an accounting of the receipts with a definite limitation on handling losses such as is common in many of the States in this country. We contend that the State Legislature might have passed a valid measure along those lines. Our point is that it did not do so; that it levied a tax upon the dealer and based the amount of the tax on the amount he should *sell, use* or *consume*".

Counsel's statement that the State did not set "a definite limitation on handling losses" is in the teeth of the law. The State did just that. It made an allowance of 3 per cent to "cover his or their losses in handling".

■ In support of their contention that the State based the amount of the tax on the amount "he should sell, use or consume", counsel quote that portion of Section 22, Article VI, of the Constitution, which provides that "On gasoline, benzine, naphtha and other motor fuels, as defined by law, when sold, used or consumed in the State of Louisiana, there shall be levied a tax not to exceed four cents (4c) per gallon, to be collected as prescribed by law".

What the Legislature evidently understood that to mean, and what it does mean, is that the tax was levied on all such motor fuel as was destined for use or consumption in this state, or for domestic consumption, and not on such products as were manufactured in, or imported into, the state for export.

In all of the acts, the tax is levied on all motor fuel "sold, used or consumed in the State of Louisiana *for domestic consumption*". Each of the acts specifically recited that "It is not the intention of this Act to levy a tax on gasoline or motor fuel produced, refined, manufactured, blended, compounded or imported in this State for export". Act No. 6 of 1928, Ex.Sess., § 6, as amended by Act No. 34 of 1934, § 5.

What the framers of the Constitution and the Legislature meant by using the comprehensive terms "when sold, used or consumed in the State of Louisiana" was that the tax was levied only on such products as were intended for domestic consumption and not for export. Each of the acts uses the phrase "for domestic consumption" in the clause imposing the tax.

Act 34 of the Regular Session of 1934 amends and reenacts Sections 1, 2, 4, 6, and 7-E of the 1928 act, as amended by Act 8 of 1930 and Act 16 of 1932. The 1934 act makes it compulsory for all dealers to furnish to the Supervisor of Public Accounts a statutory surety bond, guaranteeing the payment of all taxes, penalties, and costs levied by the act, before engaging in the business of dealer. Section 4 of that act, after stating that the giving of the bond is compulsory, goes on to state: "Said bond having been furnished and accepted, as provided herein, the dealer furnishing same shall be required to pay the tax at the time of making reports to the Supervisor of Public Accounts, as herein required, only on such gasoline or motor fuel actually sold, used, or consumed in this State, during the period for which said reports are made and in which event the tax herein levied shall become delinquent the day after the date herein fixed for the filing of said reports."

This part of the act, construed alone and without reference to other parts of it, would support counsel's contention that the Legislature intended that the tax should be paid only on such motor vehicle fuel as is actually sold, and that the tax is to be paid as and when sales are made. But this part of the act is inconsistent and out of harmony with other parts of it.

The above quoted provision, which is relied on by counsel for defendant, is found in the 1934 act, which makes the furnishing of bond compulsory and prohibits anyone who has not posted the bond from engaging in the business of "dealer". All "dealers"

are now bonded. Therefore, whatever is found in this 1934 act relating to the time for making the 3 per cent allowance or to the time for paying the tax must have reference to bonded dealers because there are now no dealers except "bonded dealers".

This 3 per cent deduction clause is found in the 1934 act, written verbatim as it was written in the 1928 act, which did not require dealers to give bond. Now, if that clause be construed to mean that the Legislature intended that the deduction should be made from the total gallonage "actually sold", and that therefore the tax should be paid on the gallonage actually sold and paid when sales are made, it does not harmonize and is inconsistent with the one which immediately follows it, which reads as follows:

"that a refund shall be made to said dealer for the tax paid on all motor fuel which after such payment shall be lost or destroyed by fire, lightning, flood, tornado, wind-storm, explosion or other accidental or providential cause.

"Provided, further, that the said refund shall be paid by the Supervisor of Public Accounts upon proper showing and authentic proof of destruction and shall be paid from the funds in the hands of the Supervisor of Public Accounts, which have been collected under this Act, and which have not been paid by the Supervisor of Public Accounts to the State Treasurer." Act No. 34 of 1934, § 2.

If the Legislature had not intended that the tax should be paid in advance of actual sales, we can conceive of no reason why it

should have inserted these refunding clauses into the 1934 act, because it is certain that there would be no occasion for a refund if the tax were not paid until sales were made. These clauses relating to the 3 per cent "allowance" from the total gallonage "received", and to the refunds to be made, are utterly inconsistent with the theory that the deduction was to be made from, and the tax to be paid only on, such gallonage as is actually sold.

Furthermore, Section 6 of the act, as amended by Act No. 335 of 1936, § 1, which declares the purpose of the statute, provides: "It is further the purpose of this Act to require the payment of the tax on any gasoline or motor fuel to be sold, used or consumed in this State immediately upon the producing, refining, manufacturing, blending, compounding or importing of such gasoline or motor fuel unless a bond, as provided herein, is furnished to guarantee the payment of said tax."

The tax is to be paid on any gasoline or motor fuel *"to be sold,* used or consumed in this State", not that actually sold, used, or consumed, and it is to be paid "immediately upon the producing * * * or importing" of such fuel into the state "unless a bond, as provided herein, is furnished to guarantee the payment of said tax".

What the clause "unless a bond * * * is furnished" means is that, if the bond is furnished, the tax need not be paid "immediately", but may be postponed until the reports of the dealer are made on the 20th day of each month, as required by Section 4 of the act. In so far as the time of making the payments is concerned, the ef-

fect of giving the bond is to allow the dealer a few days of grace for making the payments. This is shown by the following clause, found further on in Section 6 of the Act: "And it shall be the duty of the Supervisor of Public Accounts to accept a bond of any solvent surety company authorized to operate in the State of Louisiana, as herein provided *in lieu of the immediate payment of the tax.*" (Italics ours.)

Section 4 of the act contains the following provision: "provided, further, that any dealer bringing gasoline or motor fuel into the State of Louisiana for sale, use, or consumption therein, who has not furnished bond as provided in this Act, the furnishing of said bond being compulsory, shall immediately pay to the said Supervisor of Public Accounts the tax levied herein which is hereby made due and payable immediately upon same coming within the boundaries of this State."

This paragraph indicates that the tax is due when the gasoline is brought into the state for sale, use, or consumption therein.

The last above quoted clauses of the act are ambiguous and confusing. For instance, it is provided that the tax must be paid by the dealers immediately upon their bringing gasoline or other motor fuel into the state for sale, unless bond is given, and then provides that the giving of the bond is compulsory. If the giving of the bond is compulsory and no person is permitted to engage in the business of dealer without furnishing the bond, it follows that all dealers are bonded, and that therefore none of them is required to make immediate pay-

ment of the tax. And, with reference to the time of paying the tax, the word "immediately" appears over and over again in both Sections 4 and 6 of the act.

Giving effect to all the various provisions of the act, if possible, as we must do under the cardinal rules of construction, we conclude that what the Legislature intended was that dealers should pay the tax on all motor fuel manufactured or brought into the state for sale, use, or consumption in the state, or, as the act says, for domestic consumption, and that all dealers, who are now required to give bond, shall pay the tax on or before the 20th day of each calendar month when they make their reports. From this it follows that defendant is liable for the tax, according to the theory advanced by counsel for the State.

In addition to all other claims, the State is demanding from defendant $24,580, plus attorney's fees thereon, as penalty for delinquency on approximately 2,000,000 gallons of gasoline sold to the Pan-American Petroleum Corporation. The full amount of the tax on this item was paid by the Pan-American Petroleum Corporation direct to the State, but the payments were not made within the time prescribed by law; hence the State's claim for penalty. We reject this claim for the reason that, while it is true the payments were not made within the time prescribed by law, yet they were made, and the State received the entire amount due, and, so far as the record discloses, made no complaint and made no demand for the payment of penalties until the filing of this suit. This claim for penalties is stale. The last of the pay-

ments made by the Pan-American Petroleum Corporation were made something over two years prior to the filing of this suit. The State has lost nothing. This court has repeatedly held that penalties in civil actions are not favored by the courts. Massachusetts Protective Ass'n v. Ferguson, 168 La. 271, 121 So. 863; Crowe v. Equitable Life Assurance Society, 179 La. 444, 150 So. 52; Turner v. Metropolitan Life Ins. Co., 189 La. 342, 179 So. 448.

It has been held by the Federal courts, in effect, that the receipt of the tax by the tax-collecting authorities, though the payment be made after the time for making it lapsed, was a waiver of the penalties. Boswell v. City of Washington, Fed.Cas.No.1,684, 2 Cranch C.C. 18, and McHenry v. Alford, 168 U.S. 651, 18 S.Ct. 242, 42 L.Ed. 614.

■ As to the amount due the State, it claims that defendant failed to pay the state tax of 5¢ per gallon on 1,544,105.27 gallons of gasoline. Defendant admits that it failed to pay the tax on 1,611,107 gallons, but it claims that no tax is due on this gallonage because it was lost by evaporation, which item of loss, it is argued, is not included in the 3 per cent allowance to cover losses in handling. We have rejected that theory, our opinion being that the 3 per cent allowance was intended to cover all losses in handling. It is clear, therefore, that defendant admits delinquency on more gallonage than the State is claiming. In computing the amount of the tax due, we must adopt the State's figures. The State claims also that defendant failed to pay the parish tax of 2¢ per gallon on 699,922.18 gallons of the total gallonage. Since the defendant owes the state tax, it owes the parish tax also.

The state tax of 5¢ per gallon on 1,544,105.27 gallons amounts to $77,205.26. The parish tax on 699,922 gallons at 2¢ per gallon amounts to $13,398.44, or a total tax of $90,603.70. The 20 per cent penalty on this total amounts to $18,209.74, or a total tax and penalty of $108,813.44. Ten per cent attorney's fees amounts to $10,881.34. This, added to the above total, makes a grand total of $119,694.78. In addition to the above, the State claimed $1,029.79 as tax of 1¢ per gallon on 102,975 gallons of kerosene used as tractor fuel, plus penalties and attorney's fees. The trial judge found that defendant owed $611.51 under this item and rejected the State's claim for the balance. The defendant now admits that it owes this amount. The tax, plus 20 per cent penalty and 10 per cent attorney's fees, amounts to $733.81, which, added to the total of other items, brings the total amount due by defendant to $120,438.59. The judge held that plaintiff had failed to make out its case on the kerosene item for more than $611.51, and we find his ruling to be correct.

For the reasons assigned, the judgment appealed from is reversed in so far as it awarded to the State penalties on the gasoline sold to the Pan-American Petroleum Corporation, and the State's demand for such penalties is rejected; and the judgment in favor of the State and against the defendant in other respects is amended by increasing the total amount thereof to $120,438.59, with interest from judicial demand, and as thus amended it is affirmed, defendant to pay costs.