4 So.2d 634

**STANDARD OIL CO. OF LOUISIANA v. FONTENOT, Director of Revenue.**

No. 36309.

Oct. 17, 1941.

Rehearing Denied Nov. 3, 1941.

Eugene Stanley, Atty. Gen., Cicero C. Sessions, Sp. Asst. Atty. Gen., and A. Leon Hebert, Jr., of Baton Rouge, for defendant and appellant.

T. M. Milling, of Baton Rouge, Cecil Morgan, of Shreveport, and A. M. Curtis, of New Orleans, for plaintiff and appellee.

Samuel O. Clark, Jr., Asst. Atty. Gen., J. Louis Monarch, Alvin J. Rockwell, and Paul F. Mickey, Sp. Assts. to Atty. Gen., and Rene A. Viosca, U. S. Atty., Leon D. Hubert, Jr., Asst. U. S. Atty., and Robert Weinstein, Asst. U. S. Atty., all of New Orleans, for United States, intervener and appellee.

HIGGINS, Justice.

The Standard Oil Company of Louisiana, a corporation organized under the laws of this State, engaged as a dealer in selling gasoline and other petroleum products, instituted this suit under the provisions of Act No. 330 of 1938, against the Director of Revenue of the State of Louisiana, to recover the sum of $22,662.55, representing excise taxes claimed to be due the State for the month of December, 1940, and paid under protest by the plaintiff to the defendant. The plaintiff alleged that the sales of gasoline, motor fuel, lubricating oil and kerosene were expressly exempt from the payment of the taxes by certain State statutory provisions because they were made to the Federal Government or its agencies or instrumentalities, and also pleaded the implied constitutional immunity against the imposition of the taxes, stating that it was a direct and immediate burden upon essential governmental operations of the War Department of the United States.

The defendant filed exceptions of no right and no cause of action, which were overruled, and in its answer denied that the sales in question were made by the plaintiff to the United States Government or any agency, department or instrumentality thereof, and that the plaintiff was entitled to constitutional immunity from the taxes as a direct and immediate burden upon the Government or any department or instrumentality thereof; and averred that the sales were made by the plaintiff as the dealer to independent contractors, who had undertaken to construct army camps in Rapides Parish under "cost-plus-a-fixed-fee" contracts with the War Department of the Federal Government and that the Sovereign State of Louisiana, under its reserved constitutional powers, had the right to levy and collect these nondiscriminatory excise taxes.

The United States Government filed a petition of intervention, claiming the State statutory exemptions but did not plead the implied constitutional immunity from the taxes.

The contractors were not made parties to the suit nor did they intervene therein.

The district judge held that the contractors acted as agencies of the Federal Government in purchasing the gasoline, motor fuel, and lubricating oil and not as independent contractors and, therefore, the statutory exemptions were applicable and the taxes were not due. He was also of the opinion that the taxes on the sales of kerosene—not exempt by any statutory provision—were a direct and immediate

burden upon the governmental functions of the United States and, consequently, the taxes were unassessable and uncollectible, because of the implied federal constitutional immunity.

The defendant appealed.

Since the filing of this suit, the plaintiff paid, under protest, identical taxes for subsequent periods, and these taxes have been segregated pending the final outcome of this case.

The taxes sought to be levied and collected by the State of Louisiana in this case are those imposed by Act No. 6 of the Extra Session of 1928, as amended by Act No. 1 of the Extra Session of 1930, as amended (Art. V1-A, Const. of 1921), and Act No. 87 of 1936, as amended, and Act No. 15 of the First Extra Session of 1934, as amended, and Act No. 259 of 1938.

This Court has held that the taxes imposed by some of these statutes are excise taxes placed on dealers in gasoline and motor fuel and are not consumers' taxes or "sales taxes"; and that these excise taxes are not laid upon the products but upon the dealer for the right or privilege of selling, using, or consuming the product, and are due and payable immediately upon manufacture or importation of the product for distribution, sale, use, or consumption in this State, and before any transportation, sale, or other disposition thereof. State v. Sinclair Refining Co., 195 La. 288, 196 So. 349; State v. Standard Oil Co. of Louisiana, 190 La. 338, 182 So. 531; State v. Tri-State Transit Co. of Louisiana, Inc., et al., 179 La. 811, 155 So. 233; State v. City of Monroe, 177 La. 983, 149 So. 541; State v. Tri-State Transit Co. of Louisiana, Inc., et al., 173 La. 682, 138 So. 507; State v. Johnson, 173 La. 669, 680, 138 So. 503. See also, Trinityfarm Const. Co. v. Grosjean, D. C., 3 F.Supp. 785; Id., 291 U.S. 466, 54 S.Ct. 469, 78 L.Ed. 918.

The statutory exemptions pleaded by the plaintiff and the intervener are contained in the several statutes (under which the taxes are imposed) and are identical, with the exception of the statute levying the dealers' tax on kerosene which does not contain any exemption provision, and read:

"That the tax herein levied shall not apply to sales to the United States Government or any agency or department thereof * * *." 1st paragraph of Sec. 13, Act No. 259 of 1938 and Sec. 14 of Act No. 6 of the Extra Session of 1928.

The case was tried on a stipulation of facts, which substantially sets forth the following:

The S. and W. Construction Company and H. N. Rodgers & Sons Company, partnerships, and Forcum-James Company, a corporation organized and existing under the laws of the State of Tennessee, all of which are hereafter referred to as the S. and W. Construction Company and associates, and the partnership of W. Horace Williams Company entered into separate "cost-plus-a-fixed-fee" contracts for the construction of complete tent camps and cantonments, etc., at Camp Livingston and Camp Claiborne, near Alexandria, Louisiana, with the United States Government, through the War Department, which was

authorized by Acts of Congress providing for national security and the acquisition of facilities and weapons of defense. Act of June 13, 1940, c. 343, 54 Stat. 350; Act of July 2, 1940, c. 508, 54 Stat. 712.

The contracts recited that at each camp the estimated total cost of each project was the approximate sum of $4,242,655., exclusive of the contractors' fixed fee, which, in each instance amounted to the sum of $155,705. The estimated cost of the work was based upon detailed approximations agreed to by both the Government and the contractors and was subject to the express understanding that the contractors did not guarantee their correctness. The fixed-fee to be paid the contractors was to constitute complete compensation for their services, including profit and all general overhead expense.

Under the terms of Article 1 of the contracts, the contractors were obligated to "furnish the labor, materials, tools, machinery, equipment, facilities, supplies not furnished by the Government, and services, and do all things necessary for the completion of the following work * * * in accordance with the drawings and specifications or instructions * * * contained in the contracts or furnished by the contracting officers." The title to all work, completed or in the course of construction, when approved and accepted in writing was to be in the Government. Likewise, upon delivery at the site of the work or at an approved storage site, and upon inspection and acceptance, in writing, by the contracting officers, title to all materials, tools, machinery, equipment and supplies for which the contractors were entitled to reimbursement were to vest in the Government.

Under Article II of the contracts, the contractors were to be reimbursed for such actual expenditures in the performance of the work as were approved and ratified by the contracting officers, including labor, materials, tools, machinery, equipment, supplies, plant, processes, services, power, and fuel necessary for either temporary or permanent use in connection with the work.

In Article III of the contracts the method for making the various payments referred to therein was set forth. With respect to costs, it was provided that the Government was to currently reimburse the contractors upon certification and verification by the contracting officers of the original papers governing payrolls for labor, invoices for materials, and other expenditures.

Article IV of the contracts required the contractors to keep such books and records as were satisfactory to the contracting officers who had the right to inspect them.

The Standard Oil Company of Louisiana was the lowest competitive bidder in response to bids for gasoline, motor fuel, kerosene, tractor fuel and lubricating oil requested by the respective contractors, in accordance with the instructions of the constructing quartermasters, who were referred to in the contracts as the Government's contracting officers and who were the Government's representatives at the scene of the construction work. During

December 1940 the Standard Oil Company sold gasoline and other petroleum products to the contractors, pursuant to orders placed by them with it, for use and consumption in the performance of the contracts.

The constructing quartermasters were not bound to accept the recommendations of the contractors as to the competitive bids for the petroleum products, but could select other bids or require the contractors to secure additional bids. The bids of the Standard Oil Company on the petroleum products were approved by the constructing quartermasters at each camp. After a supply bid had been approved, the contractors, as the occasion required, prepared purchase orders for the materials needed and submitted them to the constructing quartermasters for approval. After each purchase order had been approved by the constructing quartermasters, the contractors forwarded the original orders to the vendor, the Standard Oil Company of Louisiana. Due to the limited storage facilities at the camps, it was necessary that daily purchases be made of petroleum products and, therefore, it was decided by the contractors and the constructing quartermasters that such purchases should be made verbally. Under this procedure, written purchase orders were prepared each week for deliveries made during the previous week. Later, during the month of December, 1940, written purchase orders were prepared on a monthly basis to cover the purchases made during the previous month. The contractors sent the orders to the constructing quartermasters for approval and after their approval, they

were sent to the Standard Oil Company. Under this arrangement, it was necessary for the Standard Oil Company to grant credit to the contractors for weekly and, subsequently, monthly periods. The orders showed that deliveries were to be made f. o. b. Camp Livingston and Camp Claiborne by the vendor's trucks, the shipments being made to the United States Constructing Quartermasters at Alexandria, La., for account of the respective named contractors. On the reverse side of each purchase order, it was stated that the order was "placed for the benefit of and is assignable to the United States Government, * * *" and that the terms of payment were understood to be effective upon arrival at destination and upon acceptance of material by duly accredited officers of the United States, and upon receipt of properly executed bills of lading and invoices. Upon the delivery of products ordered by the contractors from the suppliers, including the Standard Oil Company, at the site of the respective camps, representatives of the contractors and of the constructing quartermasters simultaneously made separate inspections of the products and prepared separate receiving and inspection reports. After the representatives of both the contractors and the constructing quartermasters had made their reports, the two were compared and if they checked in every detail, the representatives of the constructing quartermasters approved the inspection reports prepared by the representatives of the contractors, and the representatives of the contractors approved the inspection reports prepared by the representatives of the constructing

quartermasters. The approval and acceptance in each case was indicated by the signing of the reports.

The vendors' invoices were required to be submitted on forms prescribed by the War Department of the United States and when received by the contractors, the contractors' receiving and inspection reports were attached thereto and forwarded to the constructing quartermasters. · In order to obtain the approval of the constructing quartermasters, the invoices were required to check with the receiving and inspection reports. If the receiving and inspection reports of the contractors and of the constructing quartermasters did not agree in every detail, the constructing quartermasters' reports prevailed. When the amounts or quantities appearing on the constructing quartermasters' reports were less than those shown on the contractors' reports, the vendor was notified by the contractors that a shortage existed in the shipment. Unless the vendor could offer satisfactory proof to the constructing quartermasters that the quantities called for had been actually delivered, reimbursement to the contractors was not authorized by the constructing quartermasters. After the constructing quartermasters had inspected each invoice and found it to be correct in every detail, it was approved and returned to the contractors with Form 116 prescribed by the War Department. The approved invoices, upon being returned to the contractors were then forwarded by them to the Standard Oil Company together with a check, with the request that they be dated, marked "paid" and returned. After

the receipted invoices were returned to the contractors; a request for reimbursement on Form 1034 prescribed by the War Department was made out by the contractors and sent to the constructing quartermasters, and after their approval, this form was forwarded to the Finance Officer of the War Department, which had jurisdiction over the particular construction project, and, if approved by him, the contractors were then reimbursed by the War Department for the amount paid to the vendor. In some instances, competitive bids for materials required for the performance of the contracts such as fire proof sheeting, boilers, ranges and steel, were called for directly by the Quartermaster-General. After acceptance by the Quartermaster-General of one of the bids so received, he informed the constructing quartermasters at the respective · camps of such acceptance and the constructing quartermasters directed the contractors to place purchase orders for materials covered in the bids for use in connection with the performance of the contracts relating to the particular camp. On some occasions, the constructing quartermaster directed the contractors to place purchase orders for materials needed solely by the constructing quartermasters in the performance of their administrative duties.

Throughout the contracts, the contractors are called contractors and there is neither any language nor any provision directly or indirectly showing that the contracts are ones of employment, or that the contractors are to be considered as agencies or instrumentalities or departments

of the Federal Government. Neither do the Acts of Congress which authorize the War Department to enter into the contracts in any way state or indicate that the contractors are to become agencies, instrumentalities or departments of the United States Government. The contractors were not only required to furnish labor and materials, etc., under the provisions of the contracts, but were also required to furnish broad and extensive insurance protection, which is the usual custom in ordinary construction contracts but not in contracts of employment.

In paragraph 2 of Article I of the contracts it is stipulated that the Government shall pay rental for equipment owned by the contractors and that this shall be additional compensation to the contractors over and above the amount of their fixed-fees and aside from any reimbursement by the Government to the contractors for the latter's expense.

Paragraph 7 of Article II of the contracts provides that the salaries of the contractors' executive officers and the expenses incurred in conducting the contractors' main or branch offices, etc., shall not in any way be borne by the Government, indicating that the Government did not expect nor require the contractors to give up their private businesses in which they were engaged and to devote their services and time exclusively to the Government.

In paragraph 8 on the same page of the contracts, the contractors were required to take all available and personal cash discounts, allowances, rebates, etc., thus indicating that the contractors and not the

Government had entered into contractual relationship with the suppliers and vendors for various articles, materials and supplies to be used in fulfilling the contracts with the Government.

Article V of the contracts is captioned "Special requirements" and under sub-paragraph 1 (b) thereof, the contractors are required to procure all necessary permits and licenses, which an agency or department of the Government would not be required to obtain. For example, public owned motor vehicles are not subject to motor license laws in this State. In that same Article, the contractors are required to make all contracts in their own names and not bind or purport to bind the Government or the contracting officer of the Government thereunder.

The Government did not purchase the petroleum products in question directly from the Standard Oil Company and tax exemption certificates on Form 1094 were not furnished. The Government's representatives knew that the contractors called for the bids as they were directed to do by them and as a result thereof had entered into the contracts for the purchase of the petroleum products from the Standard Oil Company, which granted extensive credit to the contractors and that the vendor looked solely and only to them for payment and in no way considered that the War Department or the Federal Government was in any way bound to pay the vendor. It also appears in the record that the plaintiff declined to bill or invoice the contractors for supplies sold and delivered to them and to

certify that State or local taxes had been excluded.

On the reverse side of the purchase order furnished by the Government and required to be used by the contractors, the following language is printed: "This order is placed for the benefit of, and is assignable to the United States Government. This purchase order does not bind nor purport to bind the United States Government or officers thereunder."

In the second paragraph (d) on the reverse side of the same order there appears: "* * * and that State or local sales taxes are not included in the amounts billed."

The Standard Oil Company refused to execute the certificate, although the taxes in question are neither State nor local sales taxes.

Article II of the contracts provides generally for reimbursement for the contractors' expenditures and sub-paragraph (m) specifically establishes the Government's liability therefor, as follows:

"Payments from his own fund made by the contractor under the Social Security Act [42 U.S.C.A. § 301 et seq.], and any applicable State or local taxes, fees, or charges which the contractor may be required on account of this contract to pay on or before any plant equipment, process organization, materials, supplies, personnel; and, if approved in writing by the contracting officer in advance, permit and license fees, and royalties on patents used including those owned by the contractor."

In the case of Six Cos. v. DeVinney, D. C., 2 F.Supp. 693, 699, the plaintiff sought to enjoin the County Assessor from collecting personal property taxes from it on the ground that the property was located within the Federal Reservation and that the plaintiff was an instrumentality of the Federal Government. In dismissing the appeal and holding that the contractor was not an instrumentality of the Government, it was stated:

"* * * The case of a corporation contractor for the construction of public works is one in which, if it may be said to be an instrumentality of the government, its relations to the government are nevertheless purely contractual. It does not exercise governmental functions. It undertakes to construct according to plans and specifications adopted by officials of the government. It is organized for that and similar purposes and its primary object is to comply with the conditions of the contract for the profit to be made in so complying. * * *"

In the case of Boeing Airplane Co. et al. v. State Commissioner of Revenue and Taxation et al., 153 Kan. 712, 113 P.2d 110, the Supreme Court of Kansas had under consideration the contract between an airplane manufacturing company and the Federal Government to enlarge the company's plant facilities and equip them for the exclusive purpose of making airplanes for the Government, which agreed to reimburse the company for cost of such enlargements. The questions of federal agency or instrumentality and immunity from taxation were involved. On the first point, the holding of the Court was set forth, as follows:

"Where an airplane manufacturing company makes a contract with the federal government to enlarge its plant facilities and to equip them for the exclusive purpose of making airplanes for the government, and where the government agrees to reimburse the airplane company for the cost of such enlarged facilities and their equipment in 60 monthly payments upon audited statements thereof, and where after such 60 monthly payments are completed, such facilities and equipment will become the property of the government subject to an option in favor of the airplane company for their acquisition, it is held that the equipment purchased within this state for installation in the aforesaid facilities is subject to the two percent sales tax, and where such equipment is purchased outside the state to be installed and used in the enlarged airplane plant facilities it is subject to the compensating use tax; and in neither case are the purchases so made exempt from such taxation on the ground that they are governmental agencies or instrumentalities or on any other theory of constitutional or statutory law."

In Buckstaff Bath House Co. v. McKinley et al., 308 U.S. 358, 60 S.Ct. 279, 84 L.Ed. 322, the plaintiff corporation operated a bath house on the United States Reservation known as Hot Springs National Park, under lease from the Secretary of Interior of the United States Government, by the terms of which the operation and use of the bath house facilities, the number of bath-tubs used, charges to the public, qualifications of employees, maintenance and care of the premises, prohibition of employment of agents to solicit patronage and the authority over the assignment or transfer of the lease were subject to certain control by the Department of Interior. The Supreme Court of the United States, with Mr. Justice Douglas as its organ, stated that the corporation was engaged in business in its own behalf for profit and that the mere fact it conducted its business under a contract with the Secretary of the Interior did not convert it into an instrumentality of the Government. It was pointed out that although the corporation acted with the Government's permission and had received a privilege from the Government, it did not exercise that privilege on behalf of the Government and that the control reserved by the Government for the protection of a governmental program and the public interest was not incompatible with the retention of the status of a private enterprise. The control which was reserved and exercised did not differ from the type of control which the United States may reserve over any independent contractor without transforming him into its instrumentality.

In the case of Federal Compress & Warehouse Company v. McLean, 291 U.S. 17, 54 S.Ct. 267, 78 L.Ed. 622, the State of Mississippi levied a nondiscriminatory State license tax on the business of operating cotton warehouses and compresses under the provisions of the Federal Warehouse Act, 7 U.S.C.A. § 241 et seq. It was held that although the Government exercised control over the business, the license from the Department of Agriculture did not confer upon the company immunity from State taxation, nor was it converted into an

agency or instrumentality of the Federal Government but that in the enjoyment of the privilege it was engaged in its own behalf in the conduct of a private business for profit. It was stated that the enjoyment of such a privilege conferred by either the national or a state government, upon an individual, even though it promotes some governmental policy, does not relieve him from the tax burden under the doctrine of sovereign immunity therefrom.

In the case of Commissioner of Internal Revenue v. Modjeski, 2 Cir., 75 F.2d 468, the Court stated that a consulting engineer employed by the Delaware River Joint Commission was an independent contractor and not an agent or instrumentality of the State of Delaware and, therefore, not exempt from the payment of Federal Income Tax.

In Helvering v. Gerhardt, 304 U.S. 405, 58 S.Ct. 969, 82 L.Ed. 1427, the Court held that the salaries of employees of the New York Port Authority were subject to Federal Income Tax under the theory that the activities of a corporation created as a State agency, which were not essential to the preservation of State government, were not exempt from federal taxation, and rejected the defense based on the doctrine of agency or instrumentality of the State government. The converse of this issue was involved in the case of Utah Tax Commission v. Van Cott, 306 U.S. 511, 59 S.Ct. 605, 83 L.Ed. 950.

In Trinityfarm Construction Company v. Grosjean, 291 U.S. 466, 54 S.Ct. 469, 78 L. Ed. 918, the plaintiff had contracts with the United States Government for the construction and maintenance of levees in Louisiana for the control of the waters of the Mississippi River and sought a reversal of the judgment upholding the State's right to levy and collect excise taxes upon all gasoline or motor fuel sold or used and consumed in the State, on the ground that the contracts were federal improvements or instrumentalities; and that the enactment referred to imposed a direct burden upon them and that the State was, therefore, without power to impose the tax. The Supreme Court held that the contractor was not an agent or instrumentality of the United States but was an independent contractor. See also, Graves v. People of New York, ex rel. O'Keefe, 306 U.S. 466, 59 S. Ct. 595, 83 L.Ed. 927, 120 A.L.R. 1466; Metcalf & Eddy v. Mitchell, 269 U.S. 514, 46 S. Ct. 172, 70 L.Ed. 384; Baltimore Shipbuilding & Dry Dock Co. v. Baltimore, 195 U.S. 375, 25 S.Ct. 50, 49 L.Ed. 242; James v. Dravo Contracting Co., 302 U.S. 134, 58 S. Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318; Silas Mason Company v. Tax Commission of Washington, 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187.

In the case of Standard Oil Company v. Lee, 145 Fla. 385, 199 So. 325, the State of Florida sought to impose its gasoline sales tax upon a contractor who entered into an agreement with the Federal Government, through the Naval Department, to construct a naval air station at Jacksonville, on a "cost-plus-basis", which the Attorney-General of this State has assured us was a "cost-plus-a-fixed-fee" contract. The Court concluded that the contractor was not performing any governmental function and

was an independent contractor, and, therefore, subject to the tax which was not an immediate or direct burden upon the Federal Government, although the Government did pay the tax as a part of the purchase price of the materials.

While the following cited cases do not deal specifically with governmental "cost-plus" contracts, they do show that the weight of authority is that the status of contractors under similar contracts is one of independence and not agency: See: Annotations in 2 A.L.R. 126 and 27 A.L.R. 48; Morgan v. Smith, 159 Mass. 570, 35 N.E. 101; Whitney & Starrette Co. v. O'Rourke, 172 Ill. 177, 50 N.E. 242; Carleton v. Foundry & Machine Products Co., 199 Mich. 148, 165 N.W. 816, 19 A.L.R. 1141; Baumann v. West Allis, 187 Wis. 506, 204 N.W. 907; J. B. McCrary Engineering Co. v. White Coal Power Co., 4 Cir., 35 F.2d 142; Crown City Lodge, I. O. O. F. v. Industrial Accident Commission, 10 Cal.App. 2d 83, 52 P.2d 143; Allen v. Republic Building Co., Tex.Civ.App., 84 S.W.2d 506.

The foregoing jurisprudence is consistent with that in the field of damage suits where it has been held that under similar contracts an agency was not created thereby.

In Casement et al. v. Brown et al., 148 U. S. 615, 13 S.Ct. 672, 675, 37 L.Ed. 582, the plaintiff sued to recover the value of three barges of coal, lost, as claimed, through the negligence of the defendants. In holding that the defendants were independent contractors, and not employees of the company, and, as such, were liable for damages caused by their own negligence, the Court stated:

"With reference to the first contention, obviously the defendants were independent contractors. The plans and specifications were prepared and settled by the railroad companies. The size, form, and place of the piers were determined by them, and the defendants contracted to build piers of the prescribed form and size and at the places fixed. They selected their own servants and employés. Their contract was to produce a specified result. They were to furnish all the material and do all the work, and by the use of that material and the means of that work were to produce the completed structures. The will of the companies was represented only in the result of the work, and not in the means by which it was accomplished. This gave to the defendants the status of independent contractors, and that status was not affected by the fact that, instead of waiting until the close of the work for acceptance by the engineers of the companies, the contract provided for their daily supervision and approval of both material and work. * * *"

See also: Kruse v. Revelson, 115 Ohio St. 594, 155 N.E. 137, 55 A.L.R. 289; Carleton v. Foundry & Machine Products Co., 199 Mich. 148, 165 N.W. 816, 19 A.L.R.1141; Crown City Lodge, I. O. O. F. v. Industrial Accident Comm., 10 Cal. App.2d 83, 52 P.2d 143 and Allen v. Republic Bldg. Co., Tex.Civ.App., 84 S.W. 2d 506.

Furthermore, there is nothing in the stipulation of facts that sets forth that any of the corporation or the partnerships

contractors here involved, even if they were eligible to qualify as agents or employees of the Federal Government (which is doubtful under the general laws of the United States, 40 U.S.C.A. § 270a, Walsh-Healey Act, 49 Stat. at L. 2036, Public Act 846, 74th Congress 41 U.S.C.A. § 35 et seq., Helvering v. Powers, 293 U. S. 214, 55 S.Ct. 171, 79 L.Ed. 291) have complied with any of the formalities required by law or qualified as officers of the Federal Government.

The plaintiff and the intervener assert that the authority for the execution of the contracts are two Acts of the 76th Congress, namely, Public Act 703, approved July 2, 1940, 54 Stat. 712, and Public Act 611, approved June 13, 1940, 54 Stat. 350. It appears that attempts were made to amend proposed legislation to provide for a specific exemption from State taxes for contractors under a "cost-plus-a-fixed-fee" contract, and to legislate them into the status of an agency representing the sovereign nation. It was sought to amend Public Act 43 (53 Stat. at L. 590-592) so as to provide that all contractors who entered into authorized contracts should be held to be agents of the United States for the purpose of such contracts. The Act was passed without the proposed amendment. Prior to the passage of Public Act 588 of the 76th Congress, 54 Stat. 265, the language therein, which would have made such contractors agents of the government and would have exempted them from all taxes—federal, state and local, was stricken therefrom in the House and was concurred in by the Senate.

Cong. Rec., Vol. 80, part 7, pages 7532-7535, Amd't. 1205, H. B. 8438; Cong. Rec., Vol. 86, part 7, page 7646-7648. Therefore, when the War Department entered into the contracts in question, it was with full knowledge that Congress had refused to make such contractors agents or instrumentalities of the Government and that Congress had likewise refused to make available to such contractors a specific statutory exemption from State and local taxes. The clauses and stipulations in the "cost-plus-a-fixed-fee" contracts in question, giving the Government greater control and supervision of the contractors than is usually found in contracts with independent contractors on a "lump sum" basis, are therefore shown to have been placed in the contracts by the Government for its protection against imposition or overcharge and not for the purpose of making these contractors agencies, instrumentalities or departments of the United States Government.

The question of whether or not a contractor under the law is an independent one or an agent depends upon the intention of the parties as expressed in the contract. The usual independent contractor is the one who is the lowest bidder on a lump-sum basis. He depends for his profit or gain upon the difference between the amount that the materials, labor, etc., cost him and the amount of the contract price. The independent contractor on a "cost-plus-a-percentage-of-cost" basis is one who undertakes the construction required by the contract and the owner reimburses him for the costs of mate-

rials, labor, etc., and the contractor's profit or gain is to be a certain percentage of the total cost of the project. These types of contractors are legally classified as independent contractors. The third or new type of contract is called a "cost-plus-a-fixed-fee" contract, which means that the contractor is to be reimbursed for the costs of materials, labor, etc. by the owner and is to receive a fixed fee as his profit or gain. This fee, which is fixed as his profit or gain for the performance of the contract, is identical with the profit or gain which the contractor on a "cost-plus-a-percentage-of-the-cost" contract receives in the respect that neither contractor takes any chance of losing. The profit or gain on a "cost-plus-a-fixed-fee" contract is dissimilar from the profit or gain on a "cost-plus-a-percentage-of-the-cost" contract only in the respect that the amount is not exactly determined in advance. The only difference between the "cost-plus-a-fixed-fee" and the "cost-plus-a-percentage-of-the-cost" contract on the one hand, and a "lump-sum" contract on the other, is that in the two former cases, the contractor's profit or gain is assured, whereas, on a "lump-sum" contract, it is possible that the anticipated and expected profit may turn into a loss because of a low bid or advances in the prices of materials or the cost of labor. In all three types of contracts, however, the contractor is certainly an independent contractor, if the provisions of the contract make him so and do not in any way indicate or state that the parties intended that it was a contract of employment or agency or that the contractor was an instrumentality of

the Government. In all of the above cases, the contractor operates his business for his own profit and gain. He is not performing governmental functions and has no authority to, in anyway, bind the owner or Government either for the purchase of the materials or for the hiring of labor.

■ In the instant case, we have shown that it was not the intention of the parties to name or designate the contractors as agencies, instrumentalities or departments of the United States Government. The Debates in the House of Representatives conclusively show that Congress withheld such status from these types of contractors, as reference to the Congressional Records will reveal. Cong. Rec., Vol. 86, Part. 7, pages 7532-7535, in the Debates of June 4, 1940. Since Congress did not make such contractors agencies of the Federal Government, then clearly the War Department, as the representative of the Government, in carrying the legislation into practical effect, did not intend to do so in making the contracts with them.

■■ A fundamental rule of statutory construction is that statutes granting tax exemptions are to be strictly construed because they grant an exceptional privilege, and the right to enjoy the exemption must be clearly, unequivocally and affirmatively established. Hibernia National Bank et al. v. Louisiana Tax Commission, 195 La. 43, 196 So. 15; Pearce et al. v. Couvillon, 164 La. 155, 113 So. 801; and Louisiana & N. W. R. Co. v. State Board of Appraisers, 108 La. 14, 32 So. 184.

The exemption from the State taxes in question by the United States Government was expressly and clearly granted when the sales were made to the United States Government, or any agency of the Government, or any department of the Government. The statute does not grant the exemption in favor of the United States Government where the sales are made to a contractor who entered into a contract with the United States Government to perform work, unless the contract or the authority under which the contract was entered into shows clearly, positively and definitely that the contractor was designated, and enjoyed the status of, an agency, instrumentality, or department of the Government. The agencies, instrumentalities and departments of the Government necessarily perform governmental functions. The contractors in this case were not employed to give their full service, time and effort to the performance of the work, but undertook to build and erect the camps and improvements required by the plans and specifications furnished by the Government. The contract did not bind or require them to perform any governmental functions or operations and they entered into the contracts for profit and gain, represented by a fee predicated upon the amount of work and responsibility involved. We do not think that, even by a liberal construction of the State statute, the facts of this case bring the taxes in question within the statutory exemption, because it is most difficult to imagine an agency or department of the United States Government without any capacity, ability or right to in any way

bind the Federal Government, as the agreed statement of facts shows that the contractors in the instant case were incapable of doing.

The attorneys for the Government and the Standard Oil Company have tried to limit a consideration of the issue to the facts dealing strictly with the purchase of the petroleum products. The defendant, Director of Revenue, has taken in the full scope of the contracts to show the true legal status of the contractors. The best that can be said for the plaintiff's and the intervener's contention is that the contractors in the instant case, since the work was done on a "cost-plus-a-fixed-fee" basis, were under very strict supervision, direction and control in order that the Government could protect itself against unnecessary and excessive expenditures of money for materials and labor to be used by the contractors in connection with the performance of the contracts. These circumstances are certainly insufficient to show that the contractors were mere purchasing agents of the War Department of the Government. On the contrary, the defendant has shown that the contractors were obligated to furnish both materials and labor for the performance of the work and that the materials purchased by the contractors were to be paid for by them to the vendors and suppliers and that the Government, upon inspection and approval thereof, would reimburse the contractors for the cost of them. The vendors had no contractual relations whatsoever with the Government and the Government was not in any way liable to

them, but was solely and only liable to the contractors for reimbursement for materials accepted by its representatives. The fact that the Government had the right to have the contracts for purchases of the materials by the contractors from the vendors assigned to it negatives any idea that the contractors were the agents of the Government, because, if the contractors were agents or representatives of the Government, an assignment of the contracts and orders for purchases from the suppliers would have been unnecessary. The United States Government unquestionably had the right through any of its agencies or departments to purchase materials and supplies and thus be entitled to the statutory exemption, but the Government elected not to do so. It entered into contracts with the partnerships and the corporation engaged in business for profit for the purpose of erecting the improvements desired at the camps and, having failed to name the contractors as agents or to establish them as departments of the Government, it appears to us that the United States Government, acting under Congressional Acts, through the War Department, represented by the Quartermaster-General, has proceeded in a way so as not to take advantage of these exemptions, apparently as a matter of policy, realizing that there would be a serious disturbance and impairment of the fisc of the State, aside from the fact that great risks would result from such contractors having the .power and authority as agents or departments to bind and obligate the Federal Government.

Considering the facts herein and the above referred to jurisprudence, it is our opinion that the contractors were not agents, instrumentalities or departments of the United States Government within the meaning of the Louisiana statutory exemptions.

The Standard Oil Company has relied on the cases of Panhandle Oil Co. v. Mississippi, 277 U.S. 218, 48 S.Ct. 451, 72 L. Ed. 857, 56 A.L.R. 583; Graves v. Texas Co., 298 U.S. 393, 56 S.Ct. 818, 80 L.Ed. 1236; Casement v. Brown, 148 U.S. 615, 13 S.Ct. 672, 37 L.Ed. 582, and Indian Motocycle Co. v. United States, 283 U.S. 570, 51 S.Ct. 601, 75 L.Ed. 1277. These cases are to be distinguished from the instant one because the Court found, for instance, in the Panhandle Oil Company v. Mississippi and the Graves v. Texas Co. cases that the sales were directly to the United States Government. Furthermore, the cases have been distinguished and must be deemed limited to their specific facts, which were not the same as the facts established in this case.

In the case of King & Boozer v. State, 3 So.2d 572, also cited by the plaintiff and the intervener, the Supreme Court of Alabama, by a divided Court, held, in annulling the judgment of the Circuit Court, that the contractor under a "cost-plus-a-fixed-fee" contract was the agent for the Government in purchasing the lumber in question and, therefore, the sale was direct to the United States for its exclusive use and benefit and not for the contractors and, therefore, the sales tax was a direct and immediate tax burden on the

Federal Government and its instrumentalities. This case was followed by the same Court in United States v. Curry, 3 So.2d 582. We are informed by counsel that the Attorney-General of the United States has joined in an application asking the Supreme Court of the United States to review the cases on writs of certiorari. It is our opinion that the provisions of the contract in that case, which appear to be identical with those in the instant case, are inconsistent with any conclusion that the contractor was the agent or instrumentality of the Federal Government, purchasing directly for the Government the lumber in question. The contractor there, as here, was purchasing the materials for his own account for the purpose of fulfilling the contract and until the Government accepted the materials from him, he was the owner thereof and he was solely and only responsible and liable to pay the furnisher of the materials. Furthermore, in our opinion, the conclusions reached in these cases, are not in accord with the above outlined jurisprudence but are in keeping with the cases which we have pointed out have been restricted to their own facts or impliedly overruled.

▆ Although the intervener, the United States, neither pleaded nor claimed the implied constitutional immunity against the taxes as a direct and immediate burden upon governmental operations of the United States, the plaintiff, the Standard Oil Company, raised and pressed this issue. Since the United States has elected not to urge constitutional immunity against the taxes, it is clear that the Standard Oil Company, a Louisiana corporation and a dealer in petroleum products within the meaning of the taxing statute, does not have the right to do so, because the immunity is peculiar to the United States on account of its status as a Sovereign Nation. The Standard Oil Company, of course, enjoys no such position. The implied constitutional immunity in favor of the Federal Government against State taxes which are a direct and immediate burden upon governmental operations is a right which the United States has in no way even attempted to directly or indirectly authorize the Standard Oil Company to assert, if such authorization were permissible. It must also be borne in mind that the contractors to whom the plaintiff sold the petroleum products are not before the Court and that the Standard Oil Company does not even pretend that the United States Government is liable for the purchase price of the products sold to the contractors, or that it had any contractual relations whatever with the United States Government.

In the case of Rome v. London & Lancashire Indemnity Company, La.App., 169 So. 132, writ refused; Id., 181 La. 630, 160 So. 121; Id., La.App., 157 So. 175; Id., La.App., 156 So. 64, this Court held that the immunity of the State government or any of its subdivisions against liability for tort arising out of the negligence of its representatives or employees while engaged in governmental functions was confined to them and could not be

pleaded as a defense by the insurance liability carrier of the governmental subdivision.

In the case of Edwards v. Royal Indemnity Company, 182 La. 171, 161 So. 191, we held that the ·plea of coverture available to the husband to defeat recovery by his wife for injuries resulting from his negligent operation of an automobile, before their marriage, was a personal defense which was not available to the husband's liability insurer in an action brought by the wife directly against the insurer. This immunity from liability for such a suit resulted under our law from the status of the parties as· husband and wife during the marriage.

The foregoing authorities are adverse to plaintiff's position and are decisive of the issue that .it does not have the right to plead constitutional governmental immunity against the taxes. However, since an important federal question is involved and the defendant has not interposed any objection to the plaintiff raising this issue and has squarely met the allegations of the petition that the taxes are a direct and immediate burden on governmental operations by denying them and asserting that the taxes are remote and consequential and that the contractors were not agencies or instrumentalities of the United States Government but were independent contractors, we shall consider this point. It must be remembered that the contractual relationship was solely between the contractors and the Standard Oil Company for the purchase of the petroleum products and that the contractors

purchased these products for their own account to perform their contracts and were solely and only liable to the vendor for their purchase price. As between the vendor and the contractors upon their acceptance of the petroleum products, title passed to each of them respectively and upon acceptance and approval by the constructing quartermasters, the title then vested in the Federal Government with the obligation to reimburse the contractors for the full purchase price thereof, including all applicable State and local taxes. The statutes expressly lay the tax burden on the Standard Oil Company as a dealer in petroleum products and does not place any liability whatsoever upon the contractors, as purchasers thereof, for the taxes. There is no doubt that the vendor added the taxes into the purchase prices which were paid for the petroleum products.

In the case of Union P. Railroad Company v. Peniston, 18 Wall. 5, 36, 21 L.Ed. 787, the United States Supreme Court said:

"All State taxation which does not impair the agent's efficiency in the discharge of his duties to the government has been sustained when challenged. * * *

"It is, therefore, manifest that exemption of Federal agencies from State taxation is dependent, not upon the nature of the agents, or upon the mode of their constitution, or upon the fact that they are agents, but upon the effect of the tax; that is, upon the question whether the tax does in truth deprive them of power to serve the government as they were intend-

ed to serve it, or does hinder the efficient exercise of their power. * * *"

In the case of Baltimore Ship Building & Dry Dock Co. v. Baltimore, 195 U.S. 375, 25 S.Ct. 50, 52, 49 L.Ed. 242, the Court said:

"* * * it seems to us extravagant to say that an independent private corporation for gain, created by a state, is exempt from state taxation, either in its corporate person or its property, because it is employed by the United States, even if the work for which it is employed is important and takes much of its time."

In Trinityfarms Construction Co. v. Grosjean, 291 U.S. 466, 54 S.Ct. 469, 470, 78 L.Ed. 918, the plaintiff sought to avoid the payment of the tax due on gasoline sold and used by it in performing its contracts with the United States Government to construct levees. The implied constitutional immunity doctrine was invoked. The Court, after concluding that the contractor was an independent, one, held:

"The power granted by the commerce clause is undoubtedly broad enough to include construction and maintenance of levees in aid of navigation of the Mississippi river and to authorize the performance of the work directly by government officers and employees or pursuant to contracts such as those awarded to appellant. The latter method was chosen and the validity of the challenged tax is to be tested on that basis. It is not laid upon the choice of means, the making of the contracts, the contracts themselves, or any transaction to which the federal government is a party or in which it is immediately or directly concerned. Nor is the exaction laid or dependent upon the amounts, gross or net, received by the contractor. * * * Unquestionably, as appellant here concedes, Louisiana is free to tax the machinery, storage tanks, tools, etc., that are used for the performance of the contracts. These things are as closely connected with the work as is the gasoline in respect of which is laid the excise in question. There is no room for any distinction between the plant so employed and the gasoline used to generate power. If the payment of state taxes imposed on the property and operations of appellant affects the federal government at all, it at most gives rise to a burden which is consequential and remote and not to one that is necessary, immediate or direct. * * * Appellant's claim of immunity is without foundation."

It will be noted in that case that the contractor itself was before the Court pleading its governmental agency and instrumentality with the resulting tax immunity, which was denied by the Court, whereas, in the instant case, neither the contractors themselves nor the Government is before us urging that point.

In Standard Oil Company v. Lee, 145 Fla. 385, 199 So. 325, 326, which involved a contract on a "cost-plus-basis" (a "cost-plus-a-fixed-fee" contract), the Court said:

"The test of validity of the tax in these cases is not whether it is laid directly on the United States or one of its governmental agencies but whether or not in the way laid, it directly retards, impedes, or burdens the United States in the exercise of its constitutional powers. It cannot be questioned

that the tax here falls ultimately on the federal government. The contractors are agencies of the latter, executing a contract for profit; they do not perform any governmental functions. The burden on the federal government is consequential and remote. It increases the cost to the government but when accomplished in this manner, the federal cases appear to sanction the contract. * * *"

In James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 211, 82 L.Ed. 155, 114 A.L.R. 318, the Court upheld a percentage tax on the contractor's gross receipts from a contract with the United States. The contract provided for partial payments as the work progressed and that all the materials covered by the partial payments should " * * * thereupon become 'the sole property of the government.' " The West Virginia statute was held inapplicable to the gross receipts resulting from business in the State of Pennsylvania and outside of the State of West Virginia, but applicable and valid as to the portion derived from its activities within the State. The Court said:

"* * * The application of the principle which denies validity to such a tax has required the observing of close distinctions in order to maintain the essential freedom of the government in performing its functions, without unduly limiting the taxing power which is equally essential to both nation and state under our dual system.

* * *

"Many years ago the Court recognized and enforced the distinction between a tax laid directly upon a government contract or an instrumentality of the United States and a tax upon the property employed by an agent or contractor in performing services for the United States. 'Taxation of the agency is taxation of the means; taxation of the property of the agent is not always, or generally, taxation of the means.' Thomson v. Union P. R. [Co.], 9 Wall. 579, 591, 19 L.Ed. 792 [798].

* * *

"But if it be assumed that the gross receipts tax may increase the cost to the government, that fact would not invalidate the tax. With respect to that effect, a tax on the contractor's gross receipts would not differ from a tax on the contractor's property and equipment necessarily used in the performance of the contract. Concededly, such a tax may validly be laid. Property taxes are naturally, as in this case, reckoned as a part of the expense of doing the work. Taxes may validly be laid not only on the contractor's machinery, but on the fuel used to operate it. * * * But a tax of that sort unquestionably increases the expense of the contractor in performing his service and may, if it enters into the contractor's estimate, increase the cost to the government. The fact that the tax on the gross receipts of the contractor in the Alward Case, supra, might have increased the cost to the government of the carriage of the mails did not impress the Court as militating against its validity."

In Alward v. Johnson, 282 U.S. 509, 51 S.Ct. 273, 75 L.Ed. 496, 75 A.L.R. 9, it was held that a nondiscriminatory license tax upon an automotive transportation company

was not prohibitive in an instance where the United States mails were transported.

In Silas Mason Co., Inc., et al. v. Tax Commission of State of Washington, 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187, it was held that there was no unconstitutional burden upon the Federal Government in the imposition of the occupational license tax levied by the State of Washington when applied to the gross income of contractors on the construction and excavation in completing the Grand Coulee Dam and power plant. See also: Boeing Airplane Co. v. State Commission of Revenue, 153 Kan. 712, 113 P.2d 110, supra.

The excise or dealers' taxes in the instant case are not laid and do not fall either upon the contractors or the United States Government but upon the Standard Oil Company and, therefore, are only remote and consequential in their effect upon the Federal Government.

It is our opinion that the contractors under the "cost-plus-a-fixed-fee" contracts in this case are independent contractors; that the petroleum products were sold to them by the Standard Oil Company as such and not as agents, employees, representatives or instrumentalities of the United States Government; that the taxes in question did not immediately and directly burden the Federal Government's operation; that, if the taxes affected the Government at all, it was consequential and remote, in that the tax burden was placed directly and solely and only upon the Standard Oil Company as a dealer; and that, if the taxes or any part thereof were passed on as a part of the purchase price to the contractors and they, in turn, passed them on to the Government as a part of the cost for reimbursement, under the decisions of the Supreme Court of the United States this is not a violation of the implied constitutional immunity of the Sovereign Government of the United States against State and local taxes.

The Standard Oil Company, in the alternative, pleaded that the sales by it to the contractors were wholesale sales which were followed by retail sales by the contractors to the Federal Government and, therefore, the taxes were not due. The Government did not join in raising this issue, apparently realizing that it was inconsistent with its position that the sales were directly to the United States Government, its agencies, or representatives. The trial court did not pass upon this point. There is no doubt that under the contracts and the law that title to the petroleum products passed from the Standard Oil Company to the contractors when they purchased and accepted delivery of these products and that the title passed from the contractors to the United States Government when its representatives checked and accepted them and ordered the contractors reimbursed therefor. This, of course, is consistent with the defendant's position that the contractors were independent contractors and that the taxes were not a direct and immediate burden upon federal government operations but consequential and remote. The alternative plea of the plaintiff avails it nothing because under the provisions of the statutes and the jurisprudence, wholesale as well as retail sales are covered by the statutes and the dealer is made liable for the

taxes. State v. Sinclair Refining Co., 195 La. 288, 196 So. 349.

The issues raised by the plaintiff, the Standard Oil Company, and the intervener, the United States Government, that as to the levy of the State taxes on products delivered in the State areas which are owned in fee-simple by the United States Government or leased by it—the sites where the camps are located—the tax laws in question are void and of no effect under Article 1, Section 8, Clause 17 and Article 6, Section 1 of the 14th Amendment of the Constitution of the United States, have been abandoned by them.

The conclusion which we have reached in favor of the State Collector of Revenue, formerly the Director of Revenue—that the taxes in question were validly levied and collected from the Standard Oil Company, as a dealer, makes it unnecessary for us to consider the State's contention whether the attempt to extend the mantle of governmental immunity from State and local taxation to private businesses simply because of contractual relations with the United States Government, is unconstitutional and in violation of the reserved rights of the State of Louisiana and an invalid invasion of the reserved constitutional powers of the Sovereign State of Louisiana to levy and collect nondiscriminatory taxes.

For the reasons assigned, the judgment appealed from is annulled, and it is now ordered, adjudged and decreed that there be judgment in favor of the defendant, Rufus W. Fontenot, Collector of Revenue of the State of Louisiana, formerly the Di-

rector of Revenue of the State of Louisiana, and against the plaintiff, the Standard Oil Company of Louisiana, and the intervener, the United States Government, rejecting their demands.