CONTINENTAL COPPER & STEEL INDUSTRIES, INC.
v. HARRY BLOOM

BROWN, C. J., JENNINGS, BALDWIN, INGLIS and O'SULLIVAN, JS.

Argued March 5—decided April 30, 1953

*John W. Joy,* with whom was *William M. Pomerantz,* for the appellant (defendant).

*Harry W. Hultgren, Jr.,* with whom, on the brief, was *Richard T. Steele,* for the appellee (plaintiff).

BALDWIN, J. The plaintiff brought suit against the defendant for his refusal to accept and pay for certain fuel oil tanks which the plaintiff had manufactured pursuant to a contract with him. The court rendered judgment for the plaintiff and the defendant has appealed.

The defendant was a dealer in fuel oil tanks which he purchased from suppliers and sold to building contractors. In September, 1947, it was virtually impossible to obtain steel and there was a consequent shortage of fuel oil tanks. The plaintiff was engaged chiefly in the fabrication of steel pipe and had steel plate available for that purpose. It also had some facilities for manufacturing tanks. The defendant needed tanks. He knew that the plaintiff had a supply of steel suitable for their manufacture but that it had had only a limited experience in the fabrication of fuel oil tanks. On September 12, 1947, the defendant submitted a purchase order for thirty 275-gallon, twenty 500-gallon and ten 1000-gallon fuel oil tanks, notwithstanding the fact that the plaintiff had tried to discourage the defendant from so doing. The only basis on which the plaintiff would and did accept the order was at a price of cost of manufacture plus 10 per cent profit. The defendant knew that this price would not be competitive with the prices of regular tank manufacturers.

In October, after some of the smaller tanks had been completed, the plaintiff advised the defendant that the price of the 275-gallon tanks would be 50 per cent over the market price at that time. The defendant's accountant checked the plaintiff's costs of manufacture. The defendant complained about the high price but made no objection to the plaintiff's methods of accounting costs. At this time, the plaintiff told the defendant that the price of the 500- and

1000-gallon tanks would be more comparable to, yet much higher than, the published price for such tanks. The defendant knew that the fittings and heads for these tanks had been ordered from the suppliers but had not yet been received and that the plaintiff was proceeding to manufacture the tanks. He did not tell the plaintiff to stop. On November 13, 1947, the defendant took delivery and paid for twenty-nine of the 275-gallon tanks. He did nothing until February 17, 1948, to inform himself of the costs of the larger tanks, nor did the plaintiff advise him of them. On that date, the plaintiff notified the defendant that the tanks were ready for delivery and sent an invoice stating the price of the 500-gallon tanks at $134.77 each and the 1000-gallon tanks at $233.75 each. The published prices for such tanks, when there was no shortage of steel, were $65 and $89, respectively. The defendant refused to accept the tanks.

On June 22, 1948, the plaintiff advised the defendant that it had sold one 1000-gallon tank for $234 and sent the defendant a credit memorandum for this amount. On September 29, 1948, the plaintiff notified the defendant that unless he would pick up the remaining tanks in ten days they would be sold. The defendant still refusing to accept the tanks, the plaintiff's sales force attempted to dispose of them in the open market. By April 14, 1949, the plaintiff had sold all of the tanks at the best price it could obtain, which was less than the contract price. The court rendered judgment for $3148.31, which represented the difference between the contract price and the amount received by the plaintiff for the sale of the tanks, with interest.

The defendant's first claim is that under a contract fixing the price on a cost-plus basis no greater amount can be charged than is reasonable. A cost-

plus contract, so-called, is one wherein one of the parties undertakes to pay all costs incurred by the other party in the performance of his contract and a fixed fee over and above such costs. *People ex rel. Kerner* v. *Keeney,* 399 Ill. 611, 616, 78 N.E.2d 252; *Standard Oil Co.* v. *Fontenot,* 198 La. 644, 671, 4 So. 2d 634. The court has found, and its finding has not been questioned, that the parties agreed upon the cost-plus method of payment for performance by the plaintiff. See General Statutes § 6624. "Courts of law must allow parties to make their own contracts, and can enforce only such as they actually make. Whether the contract is wise or unwise, reasonable or unreasonable, is ordinarily an immaterial inquiry. The simple inquiry is, what is the contract? and has the plaintiff performed his part of it?" *Zaleski* v. *Clark,* 44 Conn. 218, 223; see 3 Corbin, Contracts, § 541. The language used by the parties in describing the method of fixing the price and the circumstances under which that language was used leave no doubt as to the intention of the parties. There was a steel shortage. Steel fuel oil tanks were difficult to obtain. The defendant was anxious to secure some. The plaintiff was induced to manufacture them on a cost-plus basis. Though the price was higher than either of the parties expected, the defendant, in the absence of fraud or misrepresentation, cannot now be heard to claim that it was unreasonable.

The defendant claims further that when part of the contract was completed and he complained about the price the plaintiff told him that the price for the tanks yet to be manufactured would be more in range with market prices. He argues that there was in effect a modification of the original agreement which justified him in refusing to accept the tanks at prices far in excess of the market price. The finding on this

issue was made upon conflicting evidence and the conclusion therefrom, that there was no modification of the agreement, cannot be disturbed.

There is no merit to the defendant's contention that the court applied an incorrect measure of damages. When a buyer refuses to accept and pay for goods, and there is an available market for them, the measure of damages is the difference between the contract price and the market or current price at the time the buyer refused to accept them. General Statutes § 6679. The words "available market" mean an existing market open to the plaintiff. *Charles Street Garage Co.* v. *Kaplan,* 312 Mass. 624, 627, 45 N.E.2d 928. The defendant having refused to accept the tanks, the plaintiff, after notifying the defendant, proceeded, over a period of time, to sell them. The court found that it obtained the best prices available. The rule stated is a flexible one. *Hugo V. Loewi, Inc.* v. *Geschwill,* 186 F.2d 849, 856; see 5 Corbin, Contracts, pp. 208, 209; notes, 44 A.L.R. 296, 108 A.L.R. 1482. Its cardinal purpose is just compensation for the loss incurred, a loss which, under the circumstances of this case, may reasonably be supposed to have been in the contemplation of the parties at the time they made the contract. *Torkomian* v. *Russell,* 90 Conn. 481, 485, 97 A. 760; *Jordan, Marsh & Co.* v. *Patterson,* 67 Conn. 473, 480, 481, 35 A. 521; 3 Williston, Sales (Rev. Ed.) § 582. The court's award of damages was proper.

There is no error.

In this opinion the other judges concurred.